## SOUTHERN PACIFIC COMPANY *v.* POOL.

ERROR TO THE SUPREME COURT OF THE TERRITORY OF UTAH.

No. 21. Argued January 15, 16, 1895. — Decided January 6, 1896.

In an action against a railroad company brought by one of its employés to recover damages for injuries inflicted while on duty, where the evidence is conflicting it is the province of the jury to pass upon the questions of negligence; but where the facts are undisputed or clearly preponderant, they are questions of law, for the court

In this case, after a review of the undisputed facts, it is held that there can be no doubt that the injury which formed the ground for this action was the result of the inexcusable negligence of the company's servant.

THE case is stated in the opinion.

*Mr. Maxwell Evarts* for plaintiff in error.

*Mr. Samuel Shellabarger,* (with whom was *Mr. Jeremiah M. Wilson* on the brief,) for defendant in error.

MR. JUSTICE WHITE delivered the opinion of the court.

The action was brought below to recover damages from the defendant (plaintiff in error here) upon the ground that it had negligently, on September 12, 1888, caused an injury, which resulted in the death of Pool, the plaintiff's intestate. The cause was tried by a jury. At the close of the evidence for the plaintiff, defendant moved for a nonsuit on the grounds (1) that no negligence had been shown on its part; (2) that the evidence established contributory negligence on the part

of the deceased. These motions were overruled, and exceptions reserved. The defendant thereupon rested. Exceptions were also taken to the action of the court as to the following: (*a*) an instruction of the court that if the jury found that Pool, the deceased, was a car repairer and in a different line of service from that of the negligent servant (if any such there was), and Pool's death was caused thereby, then defendant was liable; (*b*) to an instruction that the trainmen or yardmen of the defendant company were not fellow-servants of the deceased, who was a car repairer; (*c*) to the action of the court in submitting to the jury for their determination as a fact, whether Pool, the deceased, was a fellow-servant with the switchman Kilpatrick, by whose negligence it was claimed the injury resulted; and (*d*) to an instruction that, in ascertaining the quantum of damages, the jury should consider the number of the family left by the deceased, and the ages of his children.

Before the case went to the jury the defendant renewed its request for a peremptory instruction in its favor, which, being refused, exception was taken. The court in its general charge to the jury, gave as the law of the case what is usually denominated the "departmental theory" of the law of fellow-servant, that is to say, it substantially instructed that the criterion by which they were to determine whether the relation of fellow-servant existed, was by ascertaining whether the servants were employed in the same department of service, and if not so employed, they were not fellow-servants. Two questions were submitted by the court to the jury to be answered by them. They were: First, "What of the employés of the defendant, if any, were negligent in the discharge of their duty, and by which the deceased was injured?" Second, "Did the deceased use such care and precaution to avoid the injury as a prudent man, in the exercise of due diligence, should have used?" The jury returned a verdict in favor of the plaintiff, answering the first question, "Kilpatrick," and the second, "Yes." After a denial of a motion for new trial, an appeal was taken to the Supreme Court of the Territory, in which court the judgment was affirmed. The grounds

upon which this affirmance was based were that there had been no negligence on the part of the deceased, and that the switchman Kilpatrick was not a fellow-servant with the car repairer, because they were employed in different departments of service. One of the judges dissented on the ground that the deceased had been guilty of contributory negligence. 7 Utah, 303. The case was then brought by error here.

The questions which the record presents are : First, was the accident which caused the death of Pool the result of his own negligence, hence giving rise to no cause of action on behalf of his representatives ? Second, and if the accident was occasioned by the negligence of Kilpatrick, the switchman, can the representatives of the deceased recover damages resulting from such fact ? or to put the proposition in another form, Were Pool and Kilpatrick fellow-servants ? We will primarily consider the first of the foregoing enquiries, because it is manifest if the injury was brought about by the negligence of Pool, the question of fellow-servant becomes wholly immaterial.

*Was the accident caused by the negligence of Pool ?*

To answer this question involves an analysis of the evidence, (which the record fully sets out,) not for the purpose of weighing the testimony, or of ascertaining the preponderating balance thereof, but in order to arrive at the undoubted proof, from which the legal consequence, negligence, results. There can be no doubt where evidence is conflicting that it is the province of the jury to determine, from such evidence, the proof which constitutes negligence. There is also no doubt, where the facts are undisputed or clearly preponderant, that the question of negligence is one of law. *Union Pacific Railway Company* v. *McDonald*, 152 U. S. 262, 283. The rule is thus announced in that case: "Upon the question of negligence . . . the court may withdraw a case from the jury altogether, and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed, or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it. *Del-*

*aware, Lackawanna &c. Railroad* v. *Converse,* 139 U. S. 469, 472, and authorities there cited ; *Elliott* v. *Chicago, Milwaukee & St. Paul Railway,* 150 U. S. 245 ; *Anderson County Commissioners* v. *Beal,* 113 U. S. 227, 241."

The undisputed facts which the record here shows are as follows : Pool, the deceased, at the time he received the injury, was in the employ of the company as a car repairer, and had been so employed in its shops at Ogden City, Utah, for three or more years prior to his death. His duty was not only to do repair work on cars which were brought into the shop for that purpose, but also on cars outside of the shops and standing on the railway track. On the day the accident occurred, about half an hour before the usual hour for quitting their work, Pool and another car repairer, named Fowers, were ordered by the foreman of the car shops to repair the last car of a train of eighteen or twenty cars due to leave in a short time for the West. The train was standing on one of the six or seven tracks composing a railway yard, and on these various tracks there was a frequent moving to and fro of trains and a constant switching of cars backward and forward.

The work to be done consisted in attaching what was called a carrying strap (made of iron and used to hold up what was known as a Miller hook) underneath the platform, about level with the main front of the car, in advance of and outside the wheels. In addition to this work, which Pool and Fowers were sent to do, Rice, who was also a car repairer working in the shop but doing a higher grade of work, was sent from the shop to " adjust the air on the train." These three employés found that in order to do the work of repairing the strap required the moving of the car a short distance from the others in the train, and this was accordingly done by the three, Pool, Fowers, and Rice. The work " on the air," which Rice was to do, could not be executed until the repairs to be made by Pool and Fowers had been completed and the car had been recoupled to the train. The end of the car which required repair faced north towards the train from which it had just been detached, and Pool and Fowers went under the car in order to do the work assigned them, Pool on the west and

Fowers on the east side of the track. Rice waited in the neighborhood of the car on the east side thereof, so that when they had finished their work the car might be recoupled, thus enabling him to do the duty assigned him of "adjusting the air." The two men in going under the car placed no flag or other signal to warn of their presence there, and thereby protect themselves from the peril to which they were necessarily subjected. Their reason for not taking this precaution is stated in the testimony of Fowers:

"Q. Mr. Fowers, couldn't you and Mr. Pool have put up a red flag out there that would have notified — put up a red flag or some other flag that would have notified the engineer of danger?

"A. Yes, sir.

"Q. Why didn't you put up a flag?

"A. Because it was too big a work.

"Q. Because it was too much work?

"A. Yes, sir.

"Q. You thought it would take only a few minutes before you got through?

"A. Yes, sir. We also knew that we had a man stationed there to watch for us, and considered ourselves safe.

"Q. Who was the man you had stationed there to watch for you?

"A. Mr. Rice — Mr. George Rice.

"Q. And you considered you were all right with Mr. Rice to watch for you?

"A. Yes, sir.

"Q. Who was Mr. Rice?

"A. He was a car laborer from the shop.

"Q. Was he one of your car repairers?

"A. Yes, sir."

Shortly after the men went under the car a switch engine with a caboose and car moved from a track called the "caboose track" towards a switch connecting with the track on which the car was being repaired, and backed down for the purpose of coupling the caboose to the south end of this car, such end being the opposite one to that which was being repaired.

The two men under the car could not be seen by the engineer or by those on the backwardly moving caboose. As the engine and caboose came back slowly toward the car, both the men under it heard the noise caused by its movement. However, owing to a curve in the track, Fowers, who was on the east side of the car, could not see the engine and caboose approaching, but, hearing them, spoke to Pool, and said, " I believe they are coming in here." Pool, who was on the west side, leaned back and saw the switch engine and caboose coming down upon them. As he did so, a switchman by the name of Taylor, who was on the west side, was visible to and in hailing distance of Pool. The movement of Pool is thus related by Fowers: " From his position he could lean back this way and could see the cars, see the engine and caboose coming from the south to couple on. He says, ' Yes, they are coming in here.' " Thereupon Pool made a movement to get from under the car, but did not entirely do so. Fowers jumped out on the east side. As he did so he spoke to Rice, who was standing near at hand, and told him to stop the switch engine from backing, and to say that men were under the car repairing, and not to strike or couple to it, as it could not go out until repairs were finished. Rice walked to the south end of the car, and as the caboose slowly backed down, called out, when it was about twenty or thirty feet away, to Kilpatrick, a switchman, who was standing on the west side of the caboose, not to make the coupling as men were at work under the car. The caboose continued to slowly back towards the car, and when it arrived within about six feet stopped for a brief moment. Kilpatrick, on its so stopping, at once gave the signal to the engineer to back down, which signal was obeyed, the caboose striking the car with considerable force. In the meanwhile, either on the going forward of Rice or on the stoppage of the caboose, Fowers returned quickly to his work, as did also Pool. As the former stepped under the car, being uneasy lest the caboose should couple, he looked out and caught sight of a portion of Kilpatrick's body, and saw his arm wave the signal to back down. He cried out to Pool and threw himself from under the car, and was thus saved. Pool was not so alert, and

was caught between the car on which he was working and the one in front thereof, receiving a mortal injury. Whilst it is certain that Rice gave a warning call to Kilpatrick, and told him that the men were under the car and not to couple the caboose to it, there is no evidence whatever that Kilpatrick heard and understood the purport of what Rice said to him when he called to him; there is no proof that he conveyed any signal to Rice which could have produced upon Rice's mind, or upon the mind of any one, the impression that he understood that the men were under the car. There is no proof that Kilpatrick, after the warning given by Rice, transmitted any signal to the engineer to stop the train, and, therefore, there is no proof that the stop which the caboose made in its backward movement was the result of any communication, by signal or otherwise, between Kilpatrick and the engineer; nor, indeed, is there any proof that the stop was the result of anything but the caution of the engineer in backing down, under the impression that he had backed far enough to make the coupling which it was his purpose to make.

These being the undisputed facts, there can be no doubt that the fatal injury which Pool received was the result of his own inexcusable negligence. He went under the car which was standing on the track with a train in front of it, and with a certainty that a caboose was to be attached to the rear, without putting out a flag or other signal warning of his being under the car in order to protect himself from the peril which was obvious and of which he must have been aware, having been for a period of three years engaged in doing work of a like nature. This original act of negligence was continued by his subsequent conduct. As the caboose backed slowly down it was both heard and seen by him in ample time to have enabled him to get from under the car. There was also abundant opportunity for him to step out and give warning to the engineer in charge of the switch engine, and to Taylor the switchman, who was on the west side of the moving car, thus insuring absolute safety. He did neither. Nor can these acts of negligence be legally excused by conceding that Pool's conduct, whether of commission or of omission, was caused by

the reliance placed by him on the warning which he expected would be given by Rice, the car repairer, who remained on the side of the track. Either Rice was the agent of Pool or of the corporation. If he was the agent of the former, of course Pool cannot recover for an injury suffered by him in consequence of the negligence of his own agent. If Rice, in giving the warning, was the servant of the corporation, his negligence gave rise to no cause of action on behalf of Pool, since in any and every view of the law of fellow-servant, Rice and Pool were such servants. The negligence of Pool, established by the undisputed testimony, was not denied by the court below, but was treated as immaterial, in consequence of what the court considered to be proof of neglect on the part of Kilpatrick, the switchman. Such neglect on his part was treated as having been the proximate and, therefore, sole legal cause of the accident. This conclusion is thus stated in the opinion of the Supreme Court of the Territory :

"Nor can there be any question made but that Kilpatrick heard the signal from Rice to stop the engine, and that he acted upon such signal and did stop the engine about six feet from the car in question, under which the deceased was working at the time. The signal was understood by the switchman Kilpatrick, and obeyed by him. The verbal communication to Kilpatrick to stop the engine was a notice and warning as certain, positive, and safe as if there had been a red flag signal used in such case. In any event, Kilpatrick received it, understood it, and replied to it, and complied with it at the time, and he would have done no more had there been a red flag signal placed by the car."

We have already said that the record, which contains all the testimony, discloses no proof whatever either that Kilpatrick understood the call of Rice, that he gave any indication to Rice of his so understanding, or that, in consequence of Rice's warning, he signalled the stoppage of the engine, or that he did any of the things which the court below concluded the undisputed proof established that he did do. The case then, on this question, resolves itself to this, that we find no proof whatever of facts which the court below considered

to be undisputedly established. The only testimony which refers to what took place at the time the warning was given by Rice is that of Rice and Fowers, Kilpatrick not having been examined. The following excerpts from the testimony of Rice contain every word said by him which can in any way throw light on the subject:

"Q. What, if any, conversation did you have with Mr. Kilpatrick?

"A. I had no conversation with Mr. Taylor, if that is his name; I do not know him. There were two switchmen; I didn't know the names. I had no conversation with Mr. Taylor. I had no conversation any further than to tell Mr. Kilpatrick not to come up to touch the cars, there were men working under the car.

"Q. How far was he from you at that time?

"A. Well, it was twenty or thirty feet at the time I told him this.

"Q. Where was he at that time?

"A. He was on the west of the caboose.

"Q. Now, then, you told him that; what did you see, if anything, him do?

"A. Well, I saw him do nothing more until the engine and caboose stopped within six feet of this freight car that they were working on, when it stopped still; the next signal was Mr. Kilpatrick gave a motion.

"Q. What was that?

"A. For it to come back, and it came back with great force; and at that time I heard Mr. Fowers holler 'Pull up!' I run back to where Mr. Fowers was. He was at the other end of the car where he was at work previous to my going up and notifying him not to come down, and I saw Mr. Pool in between the cars, and we yelled for help. . . .

"Q. How long after you told Mr. Kilpatrick that there were men under the cars was it that you saw Mr. Kilpatrick go and make the signal?

"A. How?

"Q. How long after you told Mr. Kilpatrick that there were men under the car?

" A. How long after that? oh, it was very short.

" Q. And then what, if anything, did the engineer, on the car, on the engine that he was working, do in response to that signal; what did the engineer do with his engine in response to that?

" A. Why, he backed up.

" Q. How did he back up?

" A. He came back with great force to this car."

This testimony, it is apparent, does not even tend to show that the switchman Kilpatrick understood the warning given by Rice, or that he acted upon it by transmitting a signal to the engineer to stop the train, and then signalled to continue. The mere presence of Rice, if owing to the noise of the moving train or from other reasons his warning either did not reach or was misunderstood by Kilpatrick, was not sufficient to convey the fact that men were working under the car, and therefore it should not be coupled. Rice was an air adjuster. His work could not be done without the coupling of the car. His mere presence, therefore, if his voice was not heard and his words understood, would have naturally suggested that he desired the coupling to be done in order that his work might be accomplished. Nor can it be considered, without any evidence tending to that end, that Kilpatrick understood the warning, knew the men were under the car, signalled to stop the backward movement of the caboose, and then suddenly, without any change in the situation, give the signal to back up. Such conduct on his part would have been murder, and is certainly not to be presumed without proof, on bare suspicion. The testimony of Fowers, full excerpts therefrom being in the margin, whilst more contradictory than that of Rice, likewise fails to show that Kilpatrick actually understood Rice or acted on the warning by him given.[1]

---

[1] " Mr. Rice was standing outside of the car, and I says to him, says I, You go and stop him, and don't let them hit this car at all, and told him that it could not get out on the train until it was repaired. Of course, they could not make up the train until that car was repaired, and says I, Don't let them hit the car at all, and we will have it done in five minutes. Says he, All right; and stepped down to the other end of the car, and I saw him

An examination of this testimony at once demonstrates that
the only matter therein which seemingly tends to show that
Kilpatrick understood Rice is the statement of Fowers, that he
heard Kilpatrick make some reply, although the witness could
not give the nature of the reply. But the question is, not
whether Kilpatrick heard the voice of Rice, but whether he
understood his meaning; therefore the mere fact that the wit-
ness testifies some reply was made, without giving the reply,

---

signal for the engineer to stop, making the regular signal with his arms to
them coming up."

" Q. What, if anything, did he say at that time ?

" A. He didn't say anything at that time — he stood and signalled.   I was
standing right at the end of the car, still looking down, and saw Mr. Pool
leaning back over the rail this way — about in that position — looking back at
the engine coming.   They came up very slow within about six feet of the car
that he was working under, and then came to a stop.   I heard Mr. Rice tell
somebody not to hit the car ; that they were working there.   As soon as I
heard him say that I just went right to work, and jumped right under the
car again with Mr. Pool, and he turned his attention right to the work,
and we went to work again.   I felt a little uneasy myself, thinking they
might try to couple the caboose on to the car that we were working under.
They can do that very easily sometimes, you know, without moving it.   So
I leaned over the rail — I was kind of on my knees — and I turned my head,
and leaned over the rail to the east, and looked right out, and there I saw
one of the yardmen giving a signal to back up.   I could see the motion of
his arm and part of his body, and says I, Look out, Joe, they are right on
us ; and threw myself head first out over the rail."

On cross-examination he said :

" Q. Did you advise those switchmen to notify the engineer you were in
there ?

" A. No, sir ; I told Mr. Rice to tell the switchmen that we were in there
repairing a car.

" Q. And you relied on the switchman to attend to notifying the engineer?
You expected him to notify the engineer?

" A. Yes, sir.

" Q. To protect you both — Mr. Pool was in the same condition or posi-
tion, did he expect that, too?

" A. Sir ?

" Q. Mr. Pool and yourself both relied on the switchman to notify the
engineer, and you thought the switchman would attend to it?

" A. Yes, sir.

" Q. That he would notify them.   Could the engineer see you from where
he was, out on the engine ?   Could he see you were in there with the caboose
and car between you ?

in no way shows that Rice's warning was comprehended. Indeed, the entire context of the testimony shows that Fowers himself was uncertain whether the warning given by Rice was received and understood by Kilpatrick, for when asked in the first instance, whether Kilpatrick in giving the signal to back did so after he had been warned by Rice, answered, "Well, I suppose," a mere conjecture; and again, when asked if the engineer had stopped the engine in consequence of a signal

---

" A. No, sir."

After stating the presence of Rice beside the car, he was asked:

" Q. And you requested him to notify the engineer?

" A. Yes, sir. Understand, of course, that they could not use the air on that train until we had done these repairs, because they could not make the coupling with the rest; they were waiting for these repairs.

" Q. Sir?

" A. They were waiting for these repairs.

" Q. While he was standing there you just requested him to notify the engineer not to back back?

" A. Not the engineer but the switchman.

" Q. Not the engineer, but the switchman, not to back back the engine?

" A. Yes, sir.

" Q. You don't know whether he notified them or not?

" A. I heard him tell them not to hit the car, and that was satisfactory to me.

" Q. You supposed it would not be struck?

" A. I supposed it would not be struck; yes, sir.

" Q. Did you see the switchman yourself?

" A. I saw one of them — a part of one of them — I could see his arm and part of his body.

" Q. Well, was it the switchman that Mr. Rice spoke to that beckoned the engine to back back?

" A. Yes, sir; I heard Mr. Rice talking to that switchman, and I suppose it was that switchman.

" Q. Well, what switchman was that; who was it?

" A. I think it was Ben. Kilpatrick; I would not be positive which one it was.

" Q. But do you think it was Ben. Kilpatrick who signalled the engineer to back back?

" A. Yes, sir.

" Q. And struck this car?

" A. Yes, sir.

" Q. And he did that after he had been warned by Mr. Rice?

" A. Well, I suppose——

" Q. Well, after you heard Mr. Rice tell him?

from Kilpatrick, his reply was, "Yes, sir; it must have been," a mere opinion. On cross-examination, in answering a question asking, "Who then signalled the engineer not to back back?" Fowers answered, "Yes, sir." But the whole context of his testimony shows that the word "not" in the question was misunderstood by the witness, for he was testifying solely as to the signal given to back after he (the witness) was under the car. Indeed, this is the only signal which Fowers testifies he saw given by Kilpatrick. To construe this question and answer as relating to a presumed signal not to back given by Kilpatrick to the engineer in consequence of Rice's warning, would contradict the whole of Fowers' testimony, since it clearly shows that no such signal was seen by him, and that the only signal which he noticed was the one given to make the coupling which led to the death of Pool.

---

"A. Yes, sir.

"Q. He done that after he had been told by Mr. Rice not to hit the car?

"A. Yes, sir.

"Q. Who then signalled the engineer not to back back?

"A. Yes, sir.

"Q. It was the switchman?

"A. It was the switchman, yes, sir. . . .

"Q. I think you got back under the car, as I understand you, and commenced to fix this bolt?

"A. Not until they come to a stop.

"Q. Not until they come to a stop?

"A. Yes, sir.

"Q. Well, after they came to a stop, did you know that there was any signal, and who was it made the signal to back back farther?

"A. At the time that I saw the signal I was under the car, but leaning out over the rail, and I saw the signal for to back up; that was after they had stopped, and after I had got under the car again, and at that time I leaned over and saw, I think it was, Kilpatrick, giving a signal to back up.

"Q. You saw Kilpatrick give a signal to back up, and immediately after that signal they backed up and you sprung out?

"A. Yes, sir.

"Q. And that is the time that Pool was caught?

"A. Yes, sir."

On his redirect examination he said:

"Q. Where were you when you saw Rice communicate, do you know, to Kilpatrick?

"A. I was standing at the north end of this car.

Finding no proof, whatever, that the switchman actually understood the warning given by Rice and. acted upon it, there is nothing in the record to support the conclusion below that, as the warning was actually given and understood, Pool was thereby relieved from the legal consequence of his negligence in having gone under the car without placing the usual and customary signal, of having remained there in the presence of an impending danger, and, when there was ample opportunity to avoid it, of having failed himself to give a warning as the car moved down, which the proof shows he could have done, thus rendering his position absolutely safe.

*The judgment is reversed, and the case remanded with directions to grant a new trial.*

---

"Q. Standing there?

"A. Yes, sir.

"Q. Where was Kilpatrick; on which side of the train?

"A. He was right in front of the caboose, I think.

"Q. Where was that caboose from where you were?

"A. Well, it might have been twenty feet at that time.

"Q. I understand you to say it was about twenty feet to where Kilpatrick was?

"A. Yes, sir; when Mr. Rice spoke to him.

"Q. Did you see Kilpatrick when he spoke to him?

"A. Yes, sir.

"Q. Well, did he hear him; are you able to say that he heard him?

"A. Well, I heard Mr. Kilpatrick make some reply, but I don't know what it was.

"Q. He replied, did he, when Rice spoke?

"A. Yes, sir.

"Q. This was the time the engine was standing still?

"A. No, sir; she was moving then, and came up within about six feet and then stopped. She was stopped at the time ——

"Q. I know; but after Rice spoke to Kilpatrick the engineer stopped the engine.

"A. Yes, sir.

"Q. Was that in response to signal from Kilpatrick?

"A. Yes, sir; it must have been.

"Q. What did Kilpatrick (of course meaning Rice) say when he communicated to Kilpatrick; did he refer to your being under the car?

"A. I would not be right positive as to that. He told him not to hit the car, and I think he said we were working there."