## WHITCOMB et al. v. McNULTY et al.

(Circuit Court of Appeals, Seventh Circuit. January 16, 1901.)

### No. 685.

MASTER AND SERVANT — RAILROADS — INJURIES TO SERVANT — CONTRIBUTORY NEGLIGENCE.

A locomotive engineer, whose train was standing on a siding waiting for a passenger train, went under his engine to repair the air-brake apparatus, knowing that another freight train near him would back in on the same siding in the rear of his train in order to allow the passenger train to pass. He failed to set the brake on his engine, which would have held his train, and failed to notify either train crew that he was under his engine, and did not display any signal or warning. While thus employed, the other freight train backed against his train, forcing it forward, killing him instantly. *Held*, that he was guilty of contributory negligence.

GROSSCUP, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Wisconsin.

Mary A. McNulty, as administratrix of the estate of Patrick McNulty, deceased, brought suit against the receivers of the Wisconsin Central Company, then in the possession and operation of its line of railway, to recover damages for the death of Patrick McNulty, her intestate, under two statutes of the state of Minnesota,—one allowing a recovery by the personal representative of a deceased person for his death caused by the wrongful act or omission of another, where, if death had not ensued, the deceased might have maintained an action, the amount recovered to be for the exclusive benefit of the widow and next of kin of the deceased; the other imposing liability upon a corporation for the negligent act or omission of a co-servant causing injury. At the trial there was a verdict for the plaintiff below, and the cause is brought here for review. At the conclusion of the evidence the defendants moved the court to direct a verdict for the defendants. The motion was denied, and that ruling, among others, is assigned for error. The uncontroverted facts established at the trial were these: Gladstone, in the state of Minnesota, is a station on the line of the Wisconsin Central Railway. The main track of the railway there runs substantially east and west, the passenger station being on the south side of and immediately adjacent to the main track. North of and parallel to this main track, and connected with it at either end, is a siding or "passing track" 1,290 feet in length from switch to switch; but only 990 feet of it could be used by trains without interfering with the main track. At a point 98 feet west of the switch, connecting the siding with the main line west of the station, the line of railway was crossed by the main line of the St. Paul & Duluth Railway, and at a point 435 feet west of that switch there was a public highway crossing. Patrick McNulty, on the 27th day of September, 1897, was a locomotive engineer in the service of the receivers, and was in charge of an engine pulling freight train No. 22, bound eastward from Minneapolis. The train arrived at Gladstone at 2:40 p. m., where it was known that it would meet freight train No. 23 and passenger train No. 1, both westward bound, and in the order named. While train No. 22 was switching at that station, train No. 23 from the east arrived, and was stopped east of the station and for some 10 or 15 minutes, until train No. 22 had finished switching, had coupled up and backed upon the siding or "passing track," ready

to proceed eastward upon the arrival of passenger train No. 1. McNulty's train, No. 22, was composed of an engine, 17 cars and a caboose, of which 14 had air brakes connected and working. The engine was also equipped with air brakes, a pair of brakes upon each pair of driver wheels and upon both sets of tank wheels. When the train stopped upon the siding, the brakes upon the caboose were set, but not on the other cars or engine. Upon the siding, and to the westward of train No. 22, were two box cars, coupled and with brakes set, standing about 10 feet from the caboose of train No. 22, the rest of the siding or "passing track" being clear, but having space only for four or five cars. When train No. 22 went upon the siding, train No. 23 proceeded west along the main track, passing train No. 22 and the station house, and stopped when the entire train had passed beyond the west switch. Here it stood for a period of from 4 to 10 minutes, as variously estimated by the witnesses. This train was composed of about 30 cars, and was drawn by 2 locomotives, and was ordered by its conductor to pull down the main track west of the siding, or "passing track," and then back in on the siding, so far as possible, with the design that train No. 22 should proceed eastward immediately upon the arrival of passenger train No. 1, and train No. 23 would then back eastward upon the siding, allowing the passenger train to proceed westward. There would appear to have been on the part of the engineer of train No. 23 some demur to this order of the conductor on the ground that it would require them to open the train at the crossing of the Duluth Railway and at the highway beyond, and would lose time, but it is clear that the conductor adhered to the order, and left the train, entering the station house, and leaving the management of the train in the hands of the brakeman. As train No. 23 passed westward upon the main track, McNulty, the engineer of train No. 22, was standing on the ground near his engine, and between it and train No. 23. The conductor of train No. 23 left the engine of that train when near McNulty, and had some conversation with him, and, as the caboose passed, the conductor again boarded the train, and left it again at the station. This conductor testifies that he told McNulty that train No. 23 would back in on the siding in the rear of train No. 22, to be ready to follow No. 22 out after the arrival of the passenger. Others who were near to the parties testified to a conversation, but could not tell what was said. The fireman of train No. 22 thought they were joking upon some subject. After train No. 23 had passed westward, McNulty, taking a torch and a wrench, went under his engine to find and repair a leak in the air-brake apparatus, which had been noticed before leaving Minneapolis, and had increased so that the air pump worked continuously, threatening to impair the efficiency of the air brakes. It was his duty to find and repair that leak before leaving that station. To do this, McNulty lay upon the ground upon his left side with his head and arms extended under the locomotive between the rear driving wheel and the forward wheel of the tender. His fireman had gone to the front of the engine, and was occupied there a short time in some labor connected therewith. He returned on the south side of the engine, and as he mounted his cab saw McNulty lying there. McNulty had notified no one of his intention to go under the engine, and no one of either crew knew that he was in that position, except his fireman, who saw him there as he mounted the gangway. By turning a lever in the engine, McNulty could have set the brakes upon all the drive wheels and tender wheels of the engine and upon all the wheels of the 14 of the 17 cars in train No. 22, and the evidence showed that, if the brakes had been so set, it would have held the train under the circumstances. No flag was displayed, or any warning given by McNulty to any of the crews of either freight train. The fireman was not directed or requested to keep a lookout and give warning of any movement affecting McNulty's safety. The brakeman of train No. 23, upon that train passing the switch, threw the switch over, and signaled No. 23 to back in upon the "passing track," which signal was obeyed. The brakeman walked easterly searching for a link and pin to use in coupling the two detached cars, which were on the siding, and, finding none, gave the signal to stop, which was obeyed. He entered his caboose, and, finding what he wished, gave the signal to continue backing, which was done. He inserted the coupling pin and link in the easterly drawbar of his caboose, and then walked easterly ahead of the caboose to make the coupling

when the two cars should come in contact, and that he did... The recoil of the impact between the caboose and the two detached freight cars, together with the slack of train No. 23, which was in because the moving force came from the westerly end, impelled the two detached cars against the caboose of train No. 22, and drove that train forward a car length or more, leaving a space between the caboose of train No. 22 and the easterly end of the two detached cars of from 6 to 10 feet. Train No. 22, driven forward with the slack of that train, sent its engine forward upon the main line a distance of a car or a car and a half. The wheels of the tender of the engine on train No. 22 and of the front truck of the first car passed over McNulty, killing him instantly. Train No. 23 omitted to give any signal by whistle when it commenced to back, but it is claimed the bell was rung. The following rule of the company was introduced in evidence: "452. Car inspectors and others, whose duties require them to go under cars when in trains, must first position their blue signal, and give notice to the conductor and engineer of their intention. At district and division terminals and other inspection stations, the conductor of the train must see that the inspector is clear of the train before giving the signal to start."

Thomas H. Gill, for plaintiff in error.

J. V. Quarles and George Lines, for defendant in error.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge, after the foregoing statement of the facts, delivered the opinion of the court.

We assume that the question of the negligence of the operators of train No. 23 was properly submitted to the jury, and that its verdict is conclusive upon that subject. The refusal of the court to direct a verdict for the defendant below, and upon which error is here assigned, presents the question whether, as matter of law, the deceased was guilty of negligence directly contributing to his death. If the evidence upon that question is conflicting, its determination falls within the province of the jury, and we are concluded by the verdict; but where the facts are undisputed, or clearly preponderant, they are questions of law for the court. Southern Pac. Co. v. Pool, 160 U. S. 438, 16 Sup. Ct. 338, 40 L. Ed. 485. If McNulty was informed that train No. 23 would back upon the siding, it was sheer recklessness to place himself in the position of peril to which he was necessarily subjected. If he was not so informed, he had no right to assume, if he gave any thought to the subject, that it would not back upon the siding, and had no right to place himself in a dangerous position without warning to any one, and without setting the air brakes, either of which acts would have rendered his person reasonably secure. The rule of the company with respect to inspectors is not, in a strict sense, applicable here; but, if applicable, it would only declare a duty which the law imposes,—that proper precautions under such circumstances should be taken. Placing himself in a position of great danger with a train near him which he knew must come upon the siding in order to allow the passenger train, upon its arrival, to move westward, he had no right to assume that it would not enter upon the siding, and possibly come in contact with his train, until the arrival of the passenger train; for, as an experienced locomotive engineer, he knew, as all trainmen know, that the actions of those in charge of trains are governed by desire to save all time possible. He was bound to know that it might come in upon that

siding in advance of the arrival of the passenger train, that it might come in contact with the rear end of his train, and in the exercise of the most ordinary care he should have provided against such contingency, either by notice to the trainmen, or by the simple movement of setting the air brakes upon his own train. If it was manifest that a blow such as came would drive McNulty's engine upon or so near to the main track as to endanger the expected passenger train, that was only an additional reason why he should have taken every reasonable precaution against such a movement of his engine. There was in that situation nothing equivalent to a signal to the crew of the other freight train unless they knew of the danger involved. There is no evidence that they possessed such knowledge, and, if the air brakes had been set, such danger could not have arisen. We think that no argument could add force to the undisputed facts, which disclose incontestably the negligent omission upon the part of McNulty, clearly contributing to his tragic death. In Southern Pac. Co. v. Pool, 160 U. S. 438, 16 Sup. Ct. 338, 40 L. Ed. 485, Pool, a car repairer, went under the last car of a train of 18 or 20 cars, due to leave in a short time, and the car was detached from the train. One Rice was on the watch for any coming car or engine. As an engine backed, Rice called to Kilpatrick, a switchman, to stop the train, and it did so within about six feet of the car. Kilpatrick immediately gave the signal to back again, which signal was obeyed, the caboose striking the car with considerable force. In the meanwhile, Pool, who presumably had gotten out from under the car, went back to his work. His companion saw Kilpatrick's signal to back down, and cried out to Pool, who was unable to extricate himself, and was caught and injured. The court held that the injury to Pool was the result of his own inexcusable negligence in going under the car without giving proper signal of his position, and in remaining there in the presence of impending danger. In Hulien v. Railway Co. (Wis.) 82 N. W. 710, the case is on all fours with the one we are considering. There, as here, the locomotive engineer went under the engine to perform some duty, while another freight train had backed upon the same track, and its engine was detached, and was switching upon another track. There, as here, the deceased failed to set the brakes upon his engine or upon the train, and failed to notify any of the train crew that he was under the engine, and did not display any signal of warning. In each of these cases the court ruled that, as matter of law, the deceased was guilty of negligence preventing recovery. We are unable to distinguish the case in hand from the authorities cited, and are constrained to the conviction that the court below should have directed a verdict for the defendant upon the undisputed facts of the case.

GROSSCUP, Circuit Judge (dissenting). I am constrained to dissent. The facts in this case do not result, in my judgment, in fixing upon McNulty such contributory negligence as will prevent his recovery.

It should be noted, before proceeding to the reasons for this dissent, that it was a fairly disputed question of fact, whether the con-

ductor of train No. 23 notified McNulty that he intended to back in or not. The conductor so testified, but McNulty's fireman, who was within hearing distance, and says he heard all that was said, testifies to the contrary. Other witnesses fairly support him, and the conductor's testimony is impeached, by contrary declarations made by him prior to the trial. On this review I think we must assume that the jury found that no such notice was given to McNulty, and was supported in that finding by a sufficient weight of evidence.

The law, in assigning to each individual the proper measure of his carefulness, recognizes the activities of life, not as, ideally, they should be, but as actually they are. It recognizes that on all sides, in the relation of men toward each other, there is shortsightedness, and often negligence; and it requires each to bear this in mind, and to take reasonable precaution against its consequences. No one is exempt from a judgment of self negligence, simply by having acted upon the assumption that others will not act negligently. There are situations where the usual carelessness of others is such that it ought to become a part of one's habitual expectation.

Southern Pac. Co. v. Pool, 160 U. S. 438, 16 Sup. Ct. 338, 40 L. Ed. 485, is illustrative. Pool's duty was repair work on cars, both in the shop, and on the tracks in the yard. On the occasion of the injury he was under a car, belonging to a train of eighteen or twenty cars, standing on one of the six or seven tracks, upon which there was a frequent moving to and fro of trains, and a constant switching of cars backward and forward. There was no flag, or other signal, indicating his presence under the car, nor had the engineer any knowledge of his peril. The court held that, under these circumstances, Pool was inexcusably negligent. He had no right to assume that there would be no switching of cars—a thing to be expected—and, in consequence, no collision with the car under which he lay. A bumping together of cars in this way is one of the every day occurrences in a railroad yard.

Hulien v. Railway Co. (Wis.) 82 N. W. 710, is another illustration. Hulien, the victim of the accident, was the engineer of freight train No. 43 which, having arrived at Wittenberg, pulled in upon the passing track. Shortly afterwards freight train No. 50, arriving from the opposite direction, and passing down on the main track, backed in upon the passing track, stopping its caboose within two or three cars' length from the rear end of Hulien's train. The engine of No. 50, with several cars that had been detached, became engaged for a time in switching upon another track. In the mean time the passenger train, for which both trains were waiting, came and left.

Soon after the arrival of train No. 50 Hulien went under his engine to make some repairs. No brakes were set upon the engine, nor upon the train; nor was any notice given to Hulien's train crew, or to the crew of No. 50; nor was any signal placed at the rear of Hulien's train.

The passenger train having gone, the engine of No. 50 backed in again to take on its train of cars, and in doing so forced its own caboose against the caboose of Hulien's train, impelling it forward,

and causing the locomotive to run over the engineer, who was still under the engine.

It will be noted that the injury took place after the passenger train had left, and when, under all usual conditions, the engine of train No. 50 might be expected to couple upon the detached cars. The engineer, remaining under the engine in the face of such probabilities, is not guiltless of negligence. He ought, as a part of the usual course of events, to have expected that No. 50 would back in; and, perhaps, had no right to assume, that its momentum would be so nicely balanced, that no bumping would occur.

But while the law thus requires precaution against the foreseeable carelessness of others, it does not visit the penalties of negligence upon one who, having no reason, either in the usual course of events, or the particular circumstances of the occasion, to apprehend danger, has acted as if no danger impended. It may be carelessness to lack foresight against what, when it occurs, would not be regarded as unusual; but certainly not to lack foresight against that, which, when it occurs, comes, in the nature of things, as a complete surprise. An engineer, for instance, who sees a person walking on the track far ahead of the train is not guilty of negligence in supposing that he will get out of the way before the train reaches him. Beach, Contrib. Neg. § 38, and cases cited. One is not required to be so far seeing that nothing will surprise him. Now let us apply these distinctions to the case under review.

McNulty's engine stood as near the east end of the passing switch as would give it clearance from the incoming passenger train. The siding was too short to accommodate both freight trains at once; indeed, it could accommodate but a few cars more than McNulty's train. It was manifest that before the passenger train could obtain a right of way westward from the station, McNulty's train must have pulled out, so as to allow the other freight train to back in. The passenger train would, upon arrival, be blocked until McNulty had pulled out. It was manifest, also, that a blow on the rear, such as came, would drive McNulty's engine upon the main track; and as the passenger train was momentarily expected, might cause a collision of McNulty's engine with the incoming passenger train. I cannot escape the conviction that the incoming passenger train—momentarily expected,—with McNulty's engine carefully balanced in the clearance, was, to the crew of the other freight train, a physical situation more impressive than any signal or word of danger. Is the recklessness of the other crew that, in the face of such a danger to the passenger train, drove McNulty's engine forward, to be regarded as anything less than criminal? Is McNulty to be held to an expectation—or a suspicion—of that kind of recklessness on the part of the other crew? What use of a flag, or of verbal notice, to men whom such a situation, filled with such danger, would not deter?

The case under review is, in this respect, different from Southern Pac. Co. v. Pool, and Hulien v. Railway Co. In the Pool and Hulien Cases the law imposed a duty to take precaution against the carelessness of others, for the carelessness there complained of was

within the reasonable apprehension of the person injured. Beach, Contrib. Neg. § 38 and cases cited in note. In the McNulty Case there was no such duty, for there could reasonably be no such apprehension. The cases fall on opposite sides of the line that marks the boundary between one's duty to look out for such negligence as may, without unusualness, attend the conduct of others, and one's exemption from duty to look out for what, in the natural order of events, is not to be thought of.

The judgment is reversed and the cause remanded with directions to the court below to award a new trial.