Olive E. Dibble, Administratrix, *vs.* The New York, New Haven and Hartford Railroad Company.

Third Judicial District, Bridgeport, October Term, 1923.
Wheeler, C. J., Beach, Curtis, Keeler and Kellogg, Js.

Proof that a given practice is the prevailing practice, furnishes strong evidence of its reasonableness, which a jury ought not to disregard without some countervailing testimony; and this is especially true when the inquiry relates to a complicated problem whose difficulties are not within the range of common knowledge.

Except as otherwise provided by the Federal Safety Acts, the common-law defense of assumption of risk is open to an employer sued under the Federal Employers' Liability Act.

Plaintiff's intestate, while employed in interstate commerce as brakeman

Dibble *v*. New York, N. H. & H. R. Co.

of a switching crew in defendant's gravity classification yard, was killed by unbraked freight-cars rolling down an inclined classification track, after they had been jolted into motion by an unsuccessful attempt to couple them with others. Defendant's yard was in all respects constructed and operated in accordance with the practice prevailing in similar yards of other railroads; and plaintiff's intestate had been employed there as a member of a switching crew for two or three months. *Held* that the trial court did not err in setting aside a verdict for the plaintiff.

Argued October 26th—decided December 13th, 1923.

ACTION under the Federal Employers' Liability Act to recover damages for personal injuries resulting in the death of the plaintiff's intestate and alleged to have been caused by the defendant's negligence, brought to the Superior Court in New Haven County and tried to the jury before *Marvin, J.;* verdict for the plaintiff for $15,000, which the trial court set aside, and from this decision the plaintiff appealed. *No error.*

The complaint alleges that on July 18th, 1921, Ralph S. Dibble was employed as a brakeman of a switching crew in defendant's west-bound classification yard at Cedar Hill and engaged in interstate commerce; that at the time of the injury to the decedent, his switching engine was attached to about twenty-one freight-cars, and he was attempting to make a coupling with a string of ten other freight-cars standing on a grade; that the couplings were in a dangerous and defective condition and the cars did not couple; and that defendant's employees failed to properly apply the brakes on the standing cars, which were in a defective and dangerous condition, and said standing cars were thus caused and permitted to move and roll down and crush the plaintiff's decedent. The complaint further alleged that defendant negligently endeavored to do this work with an insufficient number of men, and negligently hurried the work and directed the men to violate the rules with reference to making couplings so that the

work could be done with excessive and dangerous speed; also that the defendant conducted its work by insufficient and dangerous methods, and failed to promulgate and enforce proper rules for the safe conduct of the work, and failed to properly apply brakes on the ten cars.

The answer denies all allegations of negligence, in a second defense sets up the defense of assumption of risk, and in a third defense that the decedent voluntarily selected a dangerous method of work. The jury rendered a plaintiff's verdict, which was set aside as against the evidence.

Plaintiff appeals from the ruling of the court granting the motion to set aside the verdict. Defendant filed a bill of exceptions under the statute, for errors in the charge and for refusals to charge as requested.

*Robert R. Rosan,* for the appellant (plaintiff).

*James W. Carpenter,* for the appellee (defendant).

BEACH, J. The whole charge of the court is not printed, but from excerpts found in the memorandum of decision on the motion to set aside the verdict and in the bill of exceptions, it appears that the court withdrew from consideration by the jury the issues as to defective brakes and failure to enforce rules. The plaintiff has not appealed from these rulings.

The claim that the defendant negligently hurried the work is really a part of the plaintiff's main contention that it negligently failed to securely brake the string of ten cars referred to in the complaint.

In all other respects the coupling operation in question was controlled by signals given by the decedent himself, and there is no testimony that the switching crew was short handed, or hurried.

Neither was there any evidence that the couplings on the cars involved were defective. They were found to be in perfect working order the next morning. The plaintiff's claim is that the jury might reasonably infer that they were defective because they failed to hitch at the first impact. These couplings were of a standard automatic type, and the uncontradicted testimony was that such couplers will not hitch on impact unless at least one of the knuckles is open. Safety levers for opening the knuckles without going between the cars were provided. It was also testified, without contradiction, that even if properly adjusted, they frequently failed to hitch, depending on the force of the impact and the perfect alignment of the couplings. It is common knowledge of travelers on passenger trains that such couplings frequently fail to hitch at the first impact, but hitch properly when the impact is repeated.

As to the two issues last referred to, it is clear that the motion to set aside the verdict was properly granted.

The basis of the trial court's ruling as to the other issues is indicated by the following excerpt from its memorandum of decision: "Therefore, it seems to the court that the issue was properly laid before the jury in the words: 'The vital part of this complaint . . . is the part of it which alleges the custom or act on the part of the railroad of leaving groups of cars standing on this incline . . . without any brakes on or insufficiently braked. . . . The question for you to consider is, was the defendant guilty of any negligence in failing to apply the brakes on the ten easterly cars on track 2 so that they were thereby caused or permitted to roll down on Mr. Dibble . . . The only question then, upon this phase of the case, is, was the method employed by the defendant in respect to leaving the ten cars in question, with the brakes off, a reasonably careful method. If you find that the practice adopted in re-

spect to leaving the brakes off of the ten standing cars
. . . was reasonably safe, your verdict must be for the
defendant.    If you find that the practice was not rea-
sonably safe, then you must consider the further ques-
tion as to whether it was a proximate contributing
cause of the accident.    Even if it were such a cause,
it would not permit a recovery if Dibble knew of it and
appreciated the dangers, or if a reasonably prudent
person in such circumstances would know and appre-
ciate it, for he would thereby assume the entire risk
of injury.'"

The uncontradicted evidence as to the facts bearing
on this issue is as follows:    The defendant's west-
bound classification yard consisted of a lead track and
thirty six classification tracks extending from east to
west on a descending grade, and switching in, at their
lower and western ends, to connecting tracks leading
to the west-bound departure yard.    The cars to be
distributed among the classification tracks were pushed
over a hump in the lead track whence they descended
by gravity, singly or in groups as the cars might be,
and were switched on to their proper classification
track by mechanism controlled from a central point.
The gradient of the lead track was about 3% near the
hump, flattening out to about 1%, and the gradient
of classification track No. 2 was one foot two and one
half inches to one hundred feet.    Each car or group of
cars was ridden by a brakeman who controlled its
speed.    The three to five cars nearest the westerly end
of each classification track were braked so as to form
a bulkhead to prevent them and others rolling down
upon them from moving out on to the connecting track
under the influence of impact and gravity.    The prac-
tice was to release the brakes on all cars behind the
bulkhead, after they had been brought to a stop.    Four
qualified witnesses employed by defendant testified

that such was the practice, and no witness testified otherwise. This was the practice though the car or group of cars in question was not brought into contact with or close proximity to those already standing on the track.

The accident happened on west-bound classification track No. 2 about 8 o'clock on the evening of July 18th, 1921. When the switching engine came into track No. 2, two strings of cars were standing on it, separated by an interval of about one hundred feet. The westerly string consisted of twenty-one cars not all coupled together, and the easterly string of ten cars. After the twenty-one car string had been coupled, the decedent, who was stationed at the easterly end of the string, signalled with his lantern the engineer to back up against the ten-car string, and this was done, but the couplings failed to hitch on impact. He then signalled the engineer to move forward in order to repeat the attempt, and at the proper time signalled him to stop. The two strings were then standing still and about two car lengths apart. The conductor of the switching crew, standing some eighty feet west of the decedent, saw him disappear between the two strings of cars, and then saw that the ten-car string was slowly rolling down upon the twenty-one cars. He shouted a warning, but the decedent was caught between the couplings and received the injuries from which he died.

Before taking up the main issues of assumption of risk and negligent practice, we refer to two collateral issues of fact. In the first place, it is contended that the testimony does not show that the defendant's practice of leaving all cars behind the bulkhead unbraked was applied in a case like this, when a string of cars stood at some distance from others. The testimony was not only that the practice covered all cars behind the bulkhead, but was explicit on the precise

point. The conductor of the switching crew, called by the plaintiff, testified thus, on cross-examination: "Now, assume you had several strings of cars standing down there, a group of four or five here, then a space, then a group of four or five there, and then a space, and so on down the track. Now, would the brakes, under the practice, be set on the head end of each one of those strings? A. No. Q. So where would the brakes be set to make it clear finally? A. On the first four or five cars on the track." And on redirect. "Q. So you let these cars stay up on the incline then without any brakes at all on them; is that it? A. Yes. Q. Let them come down any time they like on a man crossing the tracks or anything else; is that so? A. Why certainly." The head brakeman of the switching crew testified to the same effect. Whether in that respect the practice was negligent is another question hereafter discussed; but that such was the practice as testified to, there can be no question; and its importance as affecting the issue of assumption of risk is evident.

The other collateral issue relates to the plaintiff's claim that in point of fact these ten cars were not left unbraked but were "insufficiently braked." This claim is not supported by any testimony, but is based wholly on the assertion stated in the brief, as follows: "But the trouble with this custom is that it is a physical impossibility to have a string of cars weighing two hundred and fifty tons standing on an inclined track." On the contrary, the only witness questioned on that precise point testified positively, in answer to a somewhat insistent cross-examination, that the ten cars would stand there without any brakes on. In the absence of any other direct testimony, the jury could not assume it to be a fact that unbraked cars would not stand on a gradient of approximately 1%.

Taking up now the issue of assumption of risk. The

Federal Employers' Liability Act does not abolish the common-law defense of assumption of risk as applied to risks inherent in the employment, nor as applied to special risks arising from the failure of the employer to provide a safe place to work and suitable and safe appliances for the work; although as to some special risks the Federal Safety Acts do abolish that defense. In the leading case of *Seaboard Air Line Railway* v. *Horton*, 233 U. S. 492, 34 Sup. Ct. 635, in holding that a locomotive engineer had assumed the risk of a known defect in an appliance not covered by the Federal Safety Acts, the Supreme Court deals with both classes of risks, saying, on pages 504 and 505: "Some employments are necessarily fraught with danger to the workman—danger that must be and is confronted in the line of his duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not." And as to special risks: "There the employé is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. . . . When the employé does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment, without objection, or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employé assumes the risk, even though it arises out of the master's breach of duty." This case has been many times cited, and has been approved by the Supreme Court as lately as *Reed* v. *Director General* (1922), 258 U. S. 92, 95, 42 Sup. Ct. 191.

In the case at bar, the risk that cars behind the bulkhead might roll down after other cars had been jolted against them and then withdrawn in an unsuccessful attempt to make a coupling, was inherent in the practice of leaving such cars wholly unbraked on the inclined classification tracks. It was testified without contradiction that it was an every-day experience for cars standing on these tracks to roll down after being jolted by an unsuccessful switching impact; also that the decedent had been employed in this yard for two or three months as a brakeman on a switching crew, was familiar with the practice as to braking, and was a competent and experienced brakeman.

Under the rule in *Seaboard Air Line Railway* v. *Horton*, 233 U. S. 492, 34 Sup. Ct. 635, the decedent must be held to have assumed the risks naturally incident to the performance of his work under the conditions under which he was accustomed to perform it without objection.

As already stated, the plaintiff claims that the conditions at the time of the injury were exceptional and unfamiliar, and we have referred to the testimony which excludes this hypothesis. It may be added that the fact that the ten-car string originally stood apart from the twenty-one car string in no wise contributed to the decedent's injury, because the ten-car string did not start to roll until after it had been brought in contact with the other cars. It is apparent from the evidence that not all cars which come in contact are thereby coupled together, and as to the twenty-one cars standing on track 2 the testimony of the conductor of the switching crew was as follows, on redirect by counsel for plaintiff: "Q. You do not attempt to tell us, do you, that this whole twenty-one cars were on track 2, do you, when you came in there? A. Certainly. Q. The whole twenty-one cars? A. Sure. Q. And they

were not all connected, were they? A. No." The testimony also shows that in order to couple the unconnected cars of this string which stood in contact, or in close proximity, it would be necessary to first separate the unconnected cars, and the condition with all its attendant risks would then be the same as if they had originally stood apart; there would be the same necessity for forcible impact, and, if they failed to couple, the same necessity for again separating them, and the same risk that after being jolted by the first impact, they would start to roll down the incline.

In support of its claim that its practice in releasing the brakes on all cars behind the bulkhead was a reasonably safe one, the defendant called two qualified railroad experts, one from the Erie Railroad and one from the New York Central, who testified that the practice of releasing brakes on all cars behind the bulkhead was in use on those railroads, and that it was a safe, and, as one of them testified, a standard practice in the hump or gravity system of classification. On cross-examination they testified that if the bulkhead cars were taken out and others left, the brakes should be applied on the first five cars left, to form a new bulkhead. That, also, was the uncontradicted testimony as to the defendant's practice; but it has no application to the case at bar, because the ten-car string was to be taken out, and not left, and the attempted coupling which resulted in the decedent's injury was for the purpose of taking them out. The expert from the New York Central used the phrase, "when they couple on" the brakes are released. He was then asked: "Q. And suppose they come to a standstill before a coupling is made? A. The brakes are released when the rider leaves the car." Taking all the evidence together, we are of opinion that the trial court was right in holding that the finding of negligence was not supported by the evidence.

The common standard of due care is the conduct of reasonably prudent persons in like circumstances. Especially when the inquiry relates to a complicated problem whose difficulties are not within the range of common knowledge, proof that a given practice is the prevailing practice furnishes strong evidence of its reasonableness, which a jury ought not to disregard without some countervailing testimony. Two recent cases which apply this rule are *Southern Pacific Co.* v. *Berkshire*, 254 U. S. 415, 41 Sup. Ct. 162, and *Weireter* v. *Great Northern Ry. Co.* (1920), 146 Minn. 350, 353, 355, 178 N. W. 887. In the former case an engineer was struck by a mail crane while leaning out of the cab in the course of his duty. A regulation of the post-office department fixed the distance of such cranes from the equipment, though the distance so fixed is not stated in the opinion. Apparently this regulation cut no figure in the determination of the case, for Mr. Justice Holmes disposed of the issue of negligence as follows: "The question is whether the railroad is liable under the statute [Federal Employers' Liability Act] according to the principles of the common law regarding tort. The first element in it is the standard of conduct to be laid down for the road. The standard concerns a permanent condition not only at this place, but at many places along the road, and presumably at innumerable others on all the large railroads of the United States. There are no special circumstances to qualify this part of the question—which is whether or not it is consistent with the duty of a railroad to its employees to erect railroad cranes of which the end of the arm when in use is fourteen inches from the side of the train. The railroad is required and presumed to know its duty in the matter and it would seem that the court ought to be equally well informed. It cannot be that the theory of the law requires it to be left to the uncertain

judgment of a jury in every case." Citing *Southern Pacific Co.* v. *Pool*, 160 U. S. 438, 440, 16 Sup. Ct. 338, where it is said: "There is also no doubt, that where the facts are undisputed or clearly preponderant, that the question of negligence is one of law."

It is true that the standard of duty in this case does not concern a permanent condition of the right of way, but it concerns a constantly recurring condition which creates a like continuing risk.

In the second of the two cases above cited, the negligence alleged was in making a flying switch along a curved track without warning to the decedent, and it appeared in the presentation of plaintiff's case that the operation was conducted in all respects in the usual manner of switching cars in that yard. A motion for a directed defendant's verdict was granted, and in affirming the judgment below the court said: "It is true that proving that something was done in the customary way does not necessarily prove that it was not done negligently. The usual way may be a negligent way. But, when a plaintiff shows that the act, upon which negligence is predicated, was done in the customary way, the inference nearest at hand is that no negligence has been proven and the action must fail, unless he adduces some evidence by way of experts, or otherwise, that will justify the jury in concluding that, even though the act was done according to the usual custom, it was nevertheless negligently done, or unless it may be said that the common experience of the ordinary juror makes him competent to determine, without aid of evidence, whether or not the act was negligently performed. . . . It cannot be assumed that the ordinary jurors are competent, without evidence and from common knowledge to fix the standard by which switching operations must be carried on in much used railroad switch yards." In both of these

cases, as in this, the issue of negligence was almost inextricably bound up with the issue of assumption of risk. In the absence of evidence on the point, it cannot be said that the practice here in question was so inherently dangerous that the trial court erred in applying the rule thus stated. The claims as to defective equipment have been excluded for want of any evidential support, and it appears from the evidence that all necessary adjustments of couplings not defective could have been made with the safety levers provided for that purpose without going between the cars. That being so, the practice in question was not inherently dangerous in any relevant sense, for it did not require the decedent to put himself in the position of danger which resulted in his death.

There is no error.

In this opinion the other judges concurred.