## INDIANAPOLIS POWER & LIGHT CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 7448.

Circuit Court of Appeals, Seventh Circuit.

Sept. 15, 1941.

Rehearing Denied Oct. 9, 1941.

Arthur L. Gilliom and Elbert R. Gilliom, both of Indianapolis, Ind. (Karl J. Stipher, of Indianapolis, Ind., of counsel), for petitioner.

Robert B. Watts and Wm. F. Guffey, Jr., both of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and Laurence A. Knapp, Assoc. Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Lewis M. Gill, Atty., National Labor Relations Board, all of Washington, D. C., for respondent.

Before EVANS, and SPARKS, Circuit Judges, and WOODWARD, District Judge.

SPARKS, Circuit Judge.

Petitioner asks this court to review and set aside an order of the Labor Board, and the Board asks that we enforce it. The complaints upon which the order was based charged, among other things, the commission of the acts referred to in the order, the pertinent parts of which we set forth in the margin.[1] The complaint also

[1] "* * * the National Labor Relations Board hereby orders that the respondent, Indianapolis Power & Light Company, Indianapolis, Indiana, and its officers, agents, successors, and assigns, shall:

"1. Cease and desist from:

"(a) Discouraging membership in Utility Workers Organizing Committee, * * * affiliated with Congress of Industrial Organizations. in Associated Broadcast Technicians Unit * * * affiliated with American Federation of Labor, or in any other labor organization of its employees, by discharging or by laying off any of its employees or in any other

charged surveillance, and the discriminatory discharge of three additional employees not included in the order of reinstatement. These charges, however, were dismissed by the Board on recommendation of the Trial Examiner after hearing.[2]

It was stipulated that petitioner is an Indiana public utility corporation, primarily engaged in the production and distribution of electricity and steam at Indianapolis; that, incidentally, it also conducts in that locality a local retail department for the sale of electrical appliances; that it formerly owned and operated a radio broadcast station, WFBM, at Indianapolis, but this had been sold and transferred to a separate corporation, with the approval of the Federal Communications Commission, as of August 1, 1939, which was prior to the date of completion of hearings on the complaint; that after this transfer petitioner no longer had any employees at that or any radio station.

Two complaints were filed against petitioner, one arising out of its relation to one of its employees in the radio station, and the other to five employees in the generating plants. They were consolidated for hearing and for purposes of this review.

Petitioner challenges the Board's jurisdiction to enter the order against it as to either complaint. With respect to the radio station it urges that it no longer owned or operated that business at the time of the order, and that the one employee it was alleged to have discriminatorily discharged was engaged in other equivalent employment when the order was entered. Hence, it argues that his discharge could not furnish the basis for a valid order for payment of wages lost thereby. With respect to the generating plants, it insists that jurisdiction was lacking because of the local nature of their operations, which it contends did not involve interstate commerce.

Under the issues joined by the complaint and answer it is obvious that the Board had jurisdiction to pass upon those issues, whether its determination of them was right or wrong. The questions here, however, deal with the correctness of the Board's order in the light of the facts, that is to say—did the alleged unfair labor

manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment;

"(b) Encouraging membership in or otherwise supporting or assisting Indianapolis Power & Light Employees' Protective Association, * * * or any other labor organization of its employees, by discrimination in regard to hire or tenure or employment or any term or condition of employment, by urging, persuading, warning, or coercing employees to join such labor organization and/or to resign from or refuse to join U. W. O. C.; A. B. T., or any other labor organization of its employees; or by any other act or acts; and

"(c) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purposes of collective bargaining or other mutual aid or protection.

"2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Make whole Russell Rennaker for any loss of pay * * * by payment * * * of the amount he normally would have earned as wages from January 15, 1938, until February 1, 1939, * * *;

"(b) Offer to Sidney Collier and Thomas Elbreg, * * * immediate and full reinstatement to the positions which they formerly occupied * * * and make them, * * * whole for any loss of pay * * *;

"(c) Post * * * notices to its employees, stating (1) that the respondent will not engage in the conduct which it is ordered to cease and desist in paragraphs 1 (a), (b), and (c) of the Order, * * * (2) that the respondent will take the affirmative action set forth in paragraphs 2 (a) and (b) of this Order, (3) that its employees are free to become or remain members of U. W. O. C.; * * * A. B. T.; or any other labor organization, and (4) that it will not discriminate against any employee because of membership in or activity in behalf of such labor organization; * * * *"

2 "And it is further ordered that the complaint, as amended, in so far as it alleges that the respondent engaged in unfair labor practices in connection with Roy Payton, Harry Wilkins, and Dewey Logsdon, or in connection with surveillance of its employees and meetings of A. B. T. * * * or in connection with the formation of * * * I. P. and L. Employees Protective Association, be, and the same hereby is, dismissed."

practices actually threaten interstate or foreign commerce in a substantial manner, and was there substantial evidence to support the Board's findings?

It is conceded that the employees at the generating plants are not themselves engaged in interstate or foreign commerce. In Edison Co. v. Labor Board, 305 U.S. 197, at page 223, 59 S.Ct. 206, at page 214, 83 L.Ed. 126, the Court said: " * * * where the employers are not themselves engaged in interstate or foreign commerce, and the authority of the National Labor Relations Board is invoked to protect that commerce from interference or injury arising from the employers' intrastate activities, the question whether the alleged unfair labor practices do actually threaten interstate or foreign commerce in a *substantial manner* is necessarily presented. And in determining that factual question regard should be had to all the existing circumstances * * *. The justification for the exercise of federal power should clearly appear. Florida v. United States, 282 U.S. 194, 211, 212, 51 S.Ct. 119, 123, 124, 75 L.Ed. 291. But the question in such a case would relate not to the *existence* of the federal power but to the propriety of its exercise on a given state of facts." (Our italics.)

The facts upon which the Board relied in support of its jurisdiction over petitioner's generating plants engaged in its operations as a public utility are similar in many respects to those described in the Edison Company case, supra. There the Court held that the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., extended to public utilities engaged in supplying electricity, gas and steam wholly within the state (with the possible exception of that supplied for the operation of the Holland Tunnel), where a part of the service was to railroads, an airport, two telegraph companies, a telephone company and steamships engaged in interstate or foreign commerce, as well as to the various federal buildings in the city. Under the ruling of that case, we feel impelled to hold that the Board had jurisdiction over petitioner's generating plants. We shall discuss later the question of the power of the Board to enter the order with relation to petitioner as owner and operator of the radio station.

Petitioner next contends that even if the Board had jurisdiction to enter the order pertaining to employees other than those employed at station WFBM, there is no substantial evidence to support its findings that petitioner interfered with any rights guaranteed by § 7 of the Act to its generating plant employees, or that it discouraged membership in the C. I. O. union and encouraged membership in the I. P. and L. Employees Protective Association (to which we shall refer as the Association), or that it discharged Elbreg and Collier because of their activity in support of the C. I. O. union.

While the evidence was by no means undisputed, we can not say under the recent rulings of the Supreme Court, that there was none of sufficient substance to support the following facts as found by the Board. In February, 1937, before any union was organized or attempted to be organized, the six condenser pit operators employed at one of the plants had decided to make a collective request relating to working conditions through the chief engineer at that plant. Before they did so, the engineer, Goodrich, learned of their decision and talked to them individually, telling them they were absolutely wrong to try to approach petitioner collectively, and that while it would confer with individual operators about working conditions, it would not meet with them as a group. Thereafter, the C. I. O. undertook to organize workers at the generating plants, and after an organizational meeting, a local was formed, and Collier and Elbreg were elected president and secretary in August, 1937. There is evidence, though disputed, that the management sought by inquiry and admonition to discourage enrollment in that union. Under the many rulings of the Supreme Court relating to the conclusiveness of the Board's findings, we are constrained to hold that there was evidence in support of the finding that petitioner interfered with, restrained, and coerced its employees in the exercise of rights guaranteed by § 7 of the Act.

In December, 1937, petitioner's general manager sent two communications, the first addressed to department heads, and the second to Goodrich, superintendent of plants, calling for a general reduction in operating expenses, necessitated by failing business and the poor outlook for the future. He called for a reduction in personnel by not replacing employees who left, and by laying off employees wherever possible, stating that in such layoffs, the

generating system as a whole was to be considered, and employees were to be considered on the basis of merits, efficiency, and length of service with the company. In response to this requirement of reduction in the personnel, about seventy employees were discharged between January 4 and March 30, 1938, including Collier and Elbreg who were discharged on January 5, 1938. Of this number only five were members of C. I. O., and the complaint as to the other three was dismissed on motion of respondent.

█ █ The Board found that Collier and Elbreg were discharged because of their activities in the union which by that time had ceased to function. Petitioner introduced what would seem to us convincing evidence to the contrary, were we triers of the facts. However, in view of the fact that the Board is permitted to draw its own inferences from all the facts, and (under the ruling in Labor Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368), may rely upon such inferences in the absence of direct evidence in support of its findings, in opposition to direct evidence to the contrary, we are not permitted to disturb the order based on the finding of the discriminatory discharges.

█ The pertinent statute provides that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive." 29 U.S.C.A. § 160(e). The Supreme Court has held that the word "evidence" as here used means "substantial evidence," and " * * * is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Edison Co. v. Labor Board, 305 U.S. 197 at page 229, 59 S.Ct. 206, at page 217, 83 L.Ed. 126. The statute further provides that "the rules of evidence prevailing in courts of law or equity shall not be controlling." Section 10(b). The last cited case has this to say on that subject: "The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. [Citing cases.] But this assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncor-

roborated hearsay or rumor does not constitute substantial evidence."

In addition to these provisions, another section of the same law provides that the aggrieved party may have a review of the Board's order in this court. We have always presumed that this provision authorized us to correct what we in good faith thought was error of law in the Board's findings and order, including the determination whether the Board's findings were based on more than a scintilla of evidence, or upon such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. See Southern Pacific Co. v. Pool, 160 U.S. 438, 440, 16 S.Ct. 338, 40 L.Ed. 485; Edison Co. v. Labor Board, supra, 305 U.S. at pages 229, 230, 59 S.Ct. 206, 83 L.Ed. 126.

In National Labor Relations Board v. Waterman S. S. Co., 309 U.S. 206, 60 S. Ct. 493, 496, 84 L.Ed. 704, the Court said: " * * * Congress has left questions of law which arise before the Board —but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with the general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act." This language was quoted in National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368.

In that case, the Court further said: " 'Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure.' Nor does the Board lack the power to give weight to the activities of some of the supervisory employees on behalf of Independent, even though they did not have the power to hire or to fire. * * * If the words or deeds of the supervisory employees, taken in their setting, were reasonably likely to have restrained the employees' choice and if the employer may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere." Under these decisions we are powerless to disturb the Board's findings with respect to Collier and Elbreg.

The order as to station WFBM falls into two categories. Petitioner was directed to cease discouraging membership in the A. B. T. union, and it was also ordered to compensate Rennaker for the time lost between his alleged discriminatory discharge, January 15, 1938, and February 1, 1939, when he obtained equivalent employment elsewhere. Petitioner contends that the order was void in both respects.

As grounds for the asserted invalidity relating to the A. B. T. union, petitioner contends that inasmuch as it had sold the radio station prior to the hearing in this proceeding, it then had no employees eligible to membership in that union, and an order relating to it could in no way effectuate the purposes of the Act, and dealt with matters that were wholly moot. There is no question but that the transfer entirely divested petitioner of all interest in the station, and that it retained no control whatsoever over it; and that a new corporation, WFBM, Inc., had been organized for the purpose of taking over the station prior to the issuance of the complaint against petitioner, articles of incorporation having been approved and filed as of May 23, 1939. The sale had been approved by the Federal Communications Commission July 18, and formal transfer was made as of August 1, 1939.

■ Section 10(c) of the Act, provides that if upon all the testimony taken, the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any unfair labor practice (as defined in § 8), then it shall state its findings of fact and shall issue and cause to be served on such person an order requiring him to cease and desist from such unfair labor practice and to take such affirmative action as will effectuate the policies of the statute. It was held in the case, Labor Board v. Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, that an order, lawful when made, did not become moot because it was *obeyed* or because changing circumstances indicated that the need for it might be *less* than when made. Under that ruling we are not permitted to say that the negative order did not effectuate the purpose of the Act, provided there was evidence of discouragement of Rennaker with respect to his membership in A. B. T.

There is no evidence in this record that either the employer or any of its officers or managers had knowledge that Rennaker, prior to, or at the time of, his discharge, belonged to A. B. T., or that he ever contemplated joining. They denied having such knowledge. The undisputed facts are that he did not join until a short time before he was discharged, because he was not eligible. At that time no one in petitioner's employ was eligible to membership, and Rennaker never became eligible until A. B. T. changed its rules in that respect. No one in petitioner's employ, except Rennaker, was ever eligible to membership in A. B. T., and he said that he never informed petitioner or any of its officers that he had joined, or was contemplating a membership in A. B. T. He said that he merely signed the application and mailed it, and he did not say that he had informed any one of that fact. Before he was eligible, however, he did ask chief engineer Williams what he thought of A. B. T. Williams replied that he thought that would be the union for him to join. After I. P. L. was formed, Rennaker joined it, and a contract between it and respondent, covering all employees, was entered into on September 3, 1937. In November, 1937, he was notified that he was eligible to membership in A. B. T. Thereupon, he again asked Williams for advice as to what he should do. Williams replied: "No, I would answer the letter Russ and I would say that the boys now have an association of I. P. L. employees and that you are no longer interested in A. B. T. That your present representation, the employees' association, is serving the purpose admirably and there is no need for any outside connection at this time." Rennaker said: "I thanked him."

■ In view of the plenitude of the Board's power as set forth in the Link-Belt case, supra, we are not permitted to say that chief engineer Williams was not a supervisory employee, or that the Board lacked power to give weight to his activities and words, though he had no power to hire or to fire. The rule enunciated in that case, as applied here, is, if the words and deeds of Williams, taken in their setting, were reasonably likely to have restrained Rennaker's choice, and if Indianapolis Power and Light Company may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere, and an order to desist would be proper. The Board, having concluded that there was interference, is-

sued such order, and it is now conceded that this court is empowered to pass upon the question whether the Board's findings and conclusion in this respect are supported by such relevant evidence as a reasonable mind might accept as adequate to support such findings and conclusion. We think they are not.

It is proper under this rule to consider the setting of the two conversations between Rennaker and Williams, to which we have referred. They were friends, and prior to the times involved Rennaker had sought advice concerning his private affairs from Williams, and had received it. At the time of the first conversation neither Rennaker nor any of petitioner's employees were eligible to membership in A. B. T., but neither party to the conversation was aware of that fact, and Williams advised him to join it. Subsequently, A. B. T. notified Rennaker that it had revised its rules in such manner as to grant him membership, and sent him an application. Thereupon, he again sought Williams' advice with the result hereinbefore detailed. Under these circumstances we think it cannot be fairly said that Williams' words of advice were reasonably likely to have restrained Rennaker's choice. Within a very short time thereafter he became a member of A. B. T., which would indicate beyond doubt that he did not feel restrained by what Williams had said to him. Moreover, we think it can not be fairly said that the petitioner was responsible, under the circumstances related, for the words or acts of Williams in this respect. For these reasons we think the Board was in error in finding and concluding that petitioner was guilty of interference with respect to its employee or employees joining A. B. T.

Furthermore, there is no evidence in this record that petitioner or any of its officers had knowledge of Rennaker's membership in A. B. T. at the time of, or before, his release as an employee. It knew, however, that he was not satisfied with his position, and had expressed a desire, and an intention, to leave when a favorable opportunity presented itself to him. Moreover, petitioner's business was in such condition that it deemed it imperative to retrench its expenditures by discharging a number of its employees. We are warranted in taking judicial knowledge that almost every corporation and employer in the United States did precisely that thing, during the years here involved, and it certainly was not an unreasonable or unfair thing to do. Rennaker was informed of these facts by petitioner, and he never at any time, so far as petitioner knew, claimed that he was discharged because of his membership in A. B. T., or because of his union activities. Under these circumstances we think the Board's order with respect to Rennaker is "without a basis in evidence having rational probative force" (Edison v. Labor Board, supra), and that neither the findings nor the order of the Board, with respect to Rennaker's discharge, is supported by such evidence as a reasonable mind might accept as adequate for that purpose.

Petitioner further contends that the order to make Rennaker whole is void because at the time it was made he was no longer an employee. Its theory is that the Board's power to order back pay to employees discriminatorily discharged is limited to those cases where employees are lawfully ordered reinstated, and since Rennaker was otherwise employed when the order was made he cannot be considered at that time as an employee of petitioner. The question of the power of the Board to award back pay independently of reinstatement was raised in the case of Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. Although the Court did not pass upon the question expressly, the order appears to be within the power of the Board as defined by that decision, and no doubt was intended to be included among the "other minor objections to the Board's order," which the Court deemed it unnecessary to discuss, agreeing with the disposition of them by the court below.

The Board requested and consented to a modification of that part of its order which provided for payment by petitioner to public work-relief agencies of sums earned by discharged employees on work-relief projects. Petitioner's application to set aside the order of the Board is granted with respect to Rennaker and WFBM, also as to payments to work-relief agencies. It is overruled with respect to Collier and Elbreg and the generating plants. The Board's petition for an enforcement order is granted, subject to the modifications herein suggested.