## NATIONAL LABOR RELATIONS BOARD v. WEST COAST CASKET CO., Inc.

### No. 13515.

United States Court of Appeals
Ninth Circuit.

June 30, 1953.

Rehearing Denied July 29, 1953.

George J. Bott, Gen. Coun., David P. Findling, Asso. Gen. Coun., A. Norman Somers, Asst. Gen. Coun., Frederick U. Reel and Rosanna A. Blake, Attorneys, N.L.R.B., Washington, D. C., for petitioner.

James S. Duberg and Holmes E. Hobart, Los Angeles, Cal., for respondent.

Before DENMAN, Chief Judge, and ORR and POPE, Circuit Judges.

ORR, Circuit Judge.

The National Labor Relations Board, hereafter the Board, petitions for enforcement of an order issued against respondent, a corporation engaged in the manufacture and sale of caskets, pursuant to findings that violations of § 8(a)(1) and (3) of the Labor Management Relations Act of 1947, hereafter the Act, 29 U.S.C.A. § 158(a)(1) and (3), had occurred. No jurisdictional question is raised, respondent having a substantial amount of interstate purchases and sales.

During late September or early October of 1950, Local 15 of the Upholsterers International Union of North America, A.F. L., hereafter the Union, commenced a campaign to organize the employees in respondent's Los Angeles plants. The Board found that in the course of this organizational drive respondent violated § 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1), by interrogating its employees concerning their union sympathies and the reasons therefor, by threatening to discharge those employees who had refused to cross a picket line and come to work, by threatening to close one of its plants if the Union was successful, and by announcing various new economic benefits to induce the employees to reject the Union. There is ample support in the record for these findings.

In mid-October, Winkler, president of respondent corporation, interrogated employee Rowan concerning the Union's organizational campaign and whether he was "in favor of it or against it." On November 9 Winkler asked employee Malling how he felt about the Union. During the month of November Winkler also questioned employees Berg and Siebe concerning whether they thought the Union was needed and for what reasons. Such interrogation as to union sympathy and affiliation has been held to violate the Act because of its natural tendency to instill in the minds of employees fear of discrimination on the basis of the information the employer has obtained. N.L.R.B. v. State Center Warehouse & Cold Storage Co., 9 Cir., 1951, 193 F.2d 156; Joy Silk Mills, Inc., v. N.L.R.B., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732, certiorari denied 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350, Texarkana Bus Co. v. N.L.R.B., 8 Cir., 1941, 119 F.2d 480. The inference that the interrogation tended to interfere with the exercise by the employees of their guaranteed rights is greatly strengthened by the fact, subsequently to be discussed in more detail, that respondent announced new economic benefits in the course of the same conversations during which employees were questioned concerning their union sympathies.

It is uncontradicted that forelady Settle told employee Smith on November 3 that Winkler had said "if it went union, he would close the plant"; that foreman Bennett, speaking to employee Beal, quoted Winkler as saying "it would or might be necessary to close part of the plant"; and that foreman Bennett, speaking to employee Wiljamoa, stated that "if the union would get in there * * * he was afraid that Mr. Winkler would have to close up the mill." Respondent has not denied the supervisory status of Settle and Bennett or

that they were considered by the employees to be representatives of management. Such threats of reprisal for engaging in activities protected by the Act constitute a violation of § 8(a)(1), 29 U.S.C.A. § 158(a)(1). N.L.R.B. v. State Center Warehouse & Cold Storage Co., supra; N.L.R.B. v. Franks Bros. Co., 1 Cir., 1943, 137 F.2d 989, affirmed, 321 U.S. 702, 64 S.Ct. 817, 88 L. Ed. 435.

At a crucial stage in the Union's efforts to organize the employees in respondent's plants, Winkler became convinced that a strike was imminent. Winkler at this point spoke before meetings of the trimming room employees. He is quoted as telling the meeting of November 8 that those that didn't go through the picket line might as well look for something else, or words to that effect. He is said to have told the meeting of November 10 that "anyone that didn't come through the picket line needn't bother to come back." Winkler admitted discussing the possibility of a picket line during these meetings, but didn't remember "telling them in those words." The trial examiner credited the testimony of the employee witnesses. An employee who refuses to cross a picket line is in effect joining the strike and engaging in concerted activities protected by the Act. A threat to discharge such employees therefore violates § 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1). N.L.R.B. v. Hazen, 9 Cir., 1953, 203 F.2d 807; N.L.R.B. v. State Center Warehouse & Cold Storage Co., supra.

Respondent announced certain new economic benefits during the course of the Union's organizational campaign. Thus, foreman Bennett told employees Wiljamoa and Beal that respondent was planning wage increases and an improved insurance program. Employee Berg testified that Winkler talked to him around November 5 or 6 and said "I was worth more money and he was going to see about it." Berg's next paycheck reflected a five cent an hour raise. Similarly, Winkler talked to Siebe on November 6, 7, or 8, asked what wage rate he was receiving, and upon being told, said it should be higher. Siebe's next

paycheck showed an increase had been given. After a talk with Winkler, employee Malling also received a raise. Winkler contends that he decided to grant these wage increases in October, but, even were this the fact, there is sufficient basis for the Board's finding that announcement of the economic benefits was timed and designed to influence the employees in regard to the Union's campaign. It is especially significant that the announcement of the new economic benefits in each case took place during interrogation of the employees concerning their union sympathies and the reasons therefor. "Interference is no less interference because it is accomplished through allurements rather than coercion". Western Cartridge Co. v. N.L.R.B., 7 Cir., 1943, 134 F.2d 240, 244, certiorari denied 320 U.S. 746, 64 S.Ct. 48, 88 L.Ed. 443; N.L.R.B. v. Bailey Co., 6 Cir., 1950, 180 F.2d 278; N.L.R.B. v. Crown Can Co., 8 Cir., 1943, 138 F.2d 263, certiorari denied 321 U.S. 769, 64 S.Ct. 527, 88 L.Ed. 1065.

The Board found that respondent violated § 8(a)(3) and (1) of the Act, 29 U.S.C.A. § 158(a)(3) and (1), by discharging employee Smith. Reliance is placed primarily upon the following facts:

Employee Smith was a seamstress and had worked for respondent five different times between 1939 and November 8, 1950, the date she was discharged. She had always before left her job voluntarily. During these intermittent employments, the Union had made at least two attempts to organize the employees in respondent's plants. Smith was a Union member and had been active in the Union's campaigns. At the time Smith was rehired in October, 1949, her fourth employment with respondent, Winkler had warned her that he did not "want any labor trouble" and she had promised not to try to convert any of respondent's employees to the Union's cause. Smith worked until June, 1950, and again left her position with respondent. During late September or early October of 1950, the Union renewed its organizational efforts. While Winkler was on a business trip in late October, Smith came to the plant to "visit the girls" and at that time was offered a job by forelady Settle. Al-

though she would not promise to work steady, stating she would work three to eight weeks or perhaps longer, Smith took the job. Forelady Settle told Smith that the Union had been trying to organize the plant, that Winkler was "very mad about it", and is quoted by Smith as saying "I am glad this [the Union's activities] came up before you came back because he [Winkler] always blames it on you." When Winkler returned from his trip on Friday, November 3, he saw Smith working in the plant and thereupon called forelady Settle from the room. Settle informed Smith on her return that Winkler was "very mad * * * about the union." Winkler in his testimony admitted that he had questioned Settle concerning Smith's re-employment. On the following Monday, November 6, Settle notified Smith that Winkler had told her to discharge Smith because she was merely a temporary worker and two girls were coming from Kansas City who wanted to work steady. Upon Smith's comment that "you know the reason he laid me off is on account of the Union," Settle replied "it is a dirty trick, any way you put it." Smith worked until November 8 and was then formally discharged.

Respondent strongly urges that there is insufficient evidence to show that the discharge was because of union sympathies and further contends that there were valid reasons for the discharge.

It is argued that by employing Smith five times within eleven years, at least twice subsequent to her early union activities, respondent has demonstrated that Smith's union smypathies have not prevented her being hired and therefore could not reasonably have been the reason for her discharge. The last time Winkler hired Smith, however, he had warned her that he did not want any labor trouble. Further, the record discloses that the most recent organizational campaign of the Union had reached an especially critical point, the Union having petitioned for a representation election.

Two reasons are asserted for Smith's discharge. First, respondent contends that it desired a more permanent working force and that two prospective employees, interviewed in Kansas City by Winkler, were coming to take steady jobs. The two girls, however, never did obtain employment with respondent. Winkler testified that one of them came to the plant and talked to some of the workers. His testimony was exceedingly vague as to when this visit took place and respondent did not bring forward any employee who talked to the Kansas City girl during her visit. Second, respondent contends that the hiring of Smith forced another employee, Pistoresi, out of the plant because she was unwilling to work with Smith and Winkler preferred to retain Pistoresi. But Winkler could not have known Pistoresi's reason for leaving her job until he later spoke to her on the telephone, and, although Winkler testified that this telephone conversation took place before he fired Smith, respondent's own witness Pistoresi testified that Winkler "told me that *he had let her go* and I should come back and take my job back." If Smith was discharged before Winkler's conversation with Pistoresi, the reason for Pistoresi's departure from the plant, first related to Winkler at that time, could not have motivated the prior discharge of Smith.

Insofar as the trial examiner at numerous points in his intermediate report found the testimony of employees creditable and rejected the testimony of Winkler,[1] we find no evidence in the record to support respondent's contention that the trial examiner showed bias in his findings. While it is true that in this case the trial examiner consistently believed the employee witnesses and disbelieved Winkler, such fact in itself does not modify the oft-repeated rule that questions of credibility are for the trial examiner who has the opportunity to observe the demeanor of the witnesses. N.L.R.B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511.

This case may be termed "close" in the sense that not *all* the substantial evi-

---

1. The trial examiner found that Winkler's "entire demeanor while on the witness stand clearly indicated that he was with- holding the true facts regarding the issues here involved."

dence in the record supports the findings of the Board. Indeed, if we had been in the position of the trial examiner, we might perhaps have found for the respondent. However, we find apropos the Supreme Court's statement that the rule that the findings of the Board must be supported by substantial evidence on the record considered as a whole does not "mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456. The Board's finding that the reason for Smith's discharge was "Winkler's desire to rid the plant of an employee who had in the past been a strong supporter of the Union" is based largely upon the facts that respondent associated her with the union movement; that she had been warned previously not to cause "labor trouble"; that she was hired during the absence of respondent's president and during the time of a union organizational drive; and that she was discharged upon the president's return and while union agitation was particularly acute. Smith's discharge should be viewed in the total context of respondent's conduct, during the union campaign, which discloses anti-union sentiment expressed in part in a pattern of action which we have determined in the earlier portion of this opinion to involve unfair labor practices. We hold that the factual picture of respondent's conduct presented by the evidence constitutes substantial if indirect evidence on the record considered as a whole supporting the Board's finding as to respondent's motivation in discharging Smith.

Wells, business representative of the Union, testified that on the day following the discharge of Smith, November 9, the Union held a meeting at which the discharge was discussed "quite thoroughly". He stated this was one of the reasons the Union voted unanimously to strike at the meeting. The employees were also dissatisfied about respondent's alleged stalling in regard to a requested consent election and recognition of the Union as the employees' collective bargaining representative. The strike, which in fact did take place, was accordingly an unfair labor practice strike, even though other reasons were also present, since one of the reasons for it was to protest an unfair labor practice. N.L.R.B. v. Stilley Plywood Co., 4 Cir., 1952, 199 F.2d 319, certiorari denied 344 U.S. 933, 73 S.Ct. 504; N.L.R.B. v. A. Sartorius & Co., 2 Cir., 1944, 140, F.2d 203; Berkshire Knitting Mills v. N.L.R.B., 3 Cir., 1943, 139 F.2d 134, certiorari denied, 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579. Respondent contends that Smith's discharge was not a motivating cause for the strike which ensued, relying upon evidence that the discharge was not discussed at the last meeting between the Union's representative and Winkler before the strike, that the discharge was not mentioned in the Union's literature printed during the strike, and that one of the pickets upon being questioned by a non-striker gave economic reasons as his explanation for the strike. None of this evidence precludes an inference that Smith's discharge was *one* of the reasons for the strike. The trial examiner and the Board chose to believe the testimony of Wells, who was present when the strike was voted by the Union. This testimony was substantial evidence to support the Board's finding. Respondent argues that the real reason for the strike was to force it to cease purchasing from Shannon & Simpson Casket Co., a company with which the Union had been having a labor dispute. This theory is not substantiated by the record before us.

On November 13 the strike commenced and picket lines were established. On November 24 respondent was served with a copy of an unfair labor practice charge which had been filed by the Union and which alleged, *inter alia,* that Smith had been discharged for union activities. The Union wrote respondent on the same day requesting immediate reinstatement of its members who went on strike because of respondent's unfair labor practices. The receipt of this letter is admitted by respondent as well as receipt of letters from each striker requesting immediate reinstatement.

Most of these strikers have not been returned to work. The Board properly ordered reinstatements since unfair labor practice strikers are entitled to such reinstatement upon their unconditional application even if employees hired during the course of the strike must be fired. N.L.R.B. v. Kobritz, 1 Cir., 1951, 193 F.2d 8; N.L.R.B. v. Greensboro Coca Cola Bottling Co., 4 Cir., 1950, 180 F.2d 840; N.L.R.B. v. A. Sartorius & Co., supra. The record supports the finding that each of the employees named in the complaint left respondent's plant to take part in concerted activities protected by the Act.

■ The Board also found that employee Garnes was improperly discharged by respondent. Garnes testified that although he did not join the strike at its outset he had told Winkler on November 20 that if any more men joined the strike he would not cross the picket line. The following day when he came to the plant Garnes did see that more of respondent's employees had joined the strike, so he returned to his home rather than cross the picket line. The next day Garnes again came to the plant and, upon finding no pickets in front, reported for work. When asked why he had not worked the previous day, Garnes replied that it had been because there had been more pickets and he wasn't going to go through the picket line, and also because his wife was sick. Garnes testified at the hearing that if there had been no pickets he would not have returned home. Winkler in his testimony denied that Garnes had ever mentioned the picket line as a reason for not coming to work, but the trial examiner and the Board credited the testimony of Garnes. When Garnes refused to cross the picket line he was taking part with the strikers in concerted activities guaranteed by the Act. His discharge consequently violated § 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158 (a)(3) and (1).

■ A final contention made by respondent is that the Board exceeded its statutory power under § 10(c) of the Act, 29 U.S.C.A. § 160(c), in ordering that two employees taking part in the strike be made whole for any loss of pay they may have suffered, while not ordering reinstatement. The Board's failure to order reinstatement of these two employees is apparently based upon their failure to accept previous offers of reinstatement made by respondent. While this court in two early cases [2] indicated that the statute's provisions in regard to reinstatement and backpay are inseparable, the Supreme Court subsequently adopted a broad and liberal interpretation of the Board's power to order such affirmative action as will effectuate the policies of the Act. Phelps Dodge Corp. v. N.L.R.B., 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271. Other Circuits have relied upon the Phelps Dodge Corporation case in holding that the Board has power to order backpay without reinstatement. See, for example, N.L.R.B. v. National Garment Co., 166 F.2d 233, 8 Cir., 1948, certiorari denied 334 U.S. 845, 68 S.Ct. 1513, 92 L.Ed. 1768; N.L.R.B. v. Revlon Products Corp., 2 Cir., 1944, 144 F.2d 88; Indianapolis Power & Light Co. v. N.L.R.B., 7 Cir., 1941, 122 F.2d 757, certiorari denied 315 U.S. 804, 62 S.Ct. 633, 86 L.Ed. 1204. We therefore deem it appropriate to bring ourselves into conformity with this view.

A decree will be entered enforcing the Board's order.

POPE, Circuit Judge.

I concur in so much of the opinion as finds respondent guilty of unfair labor practices in attempting to discourage the union activities, contrary to § 8(a)(1). I think, however, that the evidence wholly fails to support a finding that employee Smith was discharged for union activities, or that the Union struck on account of Smith's discharge. The only evidence that Smith was thus discharged is the testimony as to what Smith said forelady Settle said to her. Settle, although a supervisor for some purposes, was not an agent of the employer authorized to make statements bind-

2. N. L. R. B. v. Carlisle Lumber Co., 9 Cir., 1938, 99 F.2d 533, certiorari denied 304 U.S. 575, 58 S.Ct. 1045, 82 L.Ed.

1539; see N. L. R. B. v. Hearst, 9 Cir., 1939, 102 F.2d 658, 664.

ing on him, or an agent any part of whose duties included making statements. Settle was not a witness. What she said to Smith was purely hearsay and inadmissible. National Labor Rel. Board v. Amalgamated Meat Cutters, 9 Cir., 202 F.2d 671, 673.

Numerous union members testified but none but Wells was asked as to what transpired at the union meeting. He alone said that the Smith discharge was there discussed "quite thoroughly". Discussed by whom? Who else was present at that meeting? As to who was there, there is no evidence. No other union member was asked about this discussion. The Union put out circulars explaining the reason for its action. None even mentioned Smith or her discharge.

I think the Universal Camera rule requires us to refuse to credit so patently improbable a tale.