AIRPORT PARKING MANAGEMENT, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Cross-Petitioner,

v.

AIRPORT PARKING MANAGEMENT, Cross-Respondent.

Nos. 82–7705, 83–7033.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 1983.

Decided Nov. 8, 1983.

Dennis P. Ruel, San Francisco, Cal., for petitioner.

Victoria Higman, N.L.R.B., Washington, D.C., for respondent.

Before WALLACE, SNEED, and FARRIS, Circuit Judges.

WALLACE, Circuit Judge:

The National Labor Relations Board (the Board) entered an order against Airport Parking Management (the employer) for violations of subsections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) and (3). The Board found that the employer violated subsection 8(a)(1) by threatening to discharge employees for strike participation and by inquiring among employees about their support for the strike. The Board also concluded that the employer violated subsections 8(a)(1) and 8(a)(3) by firing employee Allen because of his union activities and by refusing to reinstate immediately the striking employees, who struck in part because of Allen's dismissal, after they made unconditional offers to return to work. The Board ordered the employer to cease and desist from its violations, reinstate Allen and the unfair labor practice strikers with back pay, post appropriate notices, and expunge from the records of Allen and the strikers all references to their discharge or failure to be reinstated. 264 N.L.R.B. No. 2 (1983). The employer filed a petition for review under 29 U.S.C. § 160(f). The Board cross-applied for enforcement of its order under 29 U.S.C. § 160(e). We deny the petition and enforce the order.

## I

The employer operates a taxi dispatch system at San Francisco International Airport. Its dispatchers and cashiers belong to the Office and Professional Employees International Union, Local Number 3, AFL–CIO (the union). On June 30, 1980, the collective bargaining agreement between the union and the employer covering the terms of employment for dispatchers and cashiers expired. The employer and the union agreed to extend the contract indefinitely while negotiating a successor agreement, but each retained the right to terminate the extension on seventy-two hours notice. The chief negotiator for the union was Jones, its business representative. Allen, a dispatcher and union shop steward, also participated in the negotiations.

About August 22, 1980, Riddle, the manager of taxi operations and the supervisor of Allen and the other taxi dispatchers and cashiers, telephoned an employee and union member and stated he had heard rumors of a strike and wanted to know who would work if the union called one. Riddle also said the employees were going to lose jobs because of Allen, Jones, and the union. Riddle cautioned another employee that if the employees followed Jones and Allen, the employees would lose their jobs. At a union meeting on August 25, its members voted to give Jones authority to terminate the extension of the contract while continuing to negotiate. Around August 28, Riddle, in an acrimonious conversation, told Allen that anyone who went on strike would be fired. Riddle also told Allen that he owed Riddle loyalty, because if it were not for Riddle, the employees would not be working for the employer. A few days later, Riddle repeated essentially the same message to Allen. On September 3, Riddle again advised an employee that if the employees listened to Allen, they would lose their jobs. Riddle also said he was drawing up a list of people who would work, and they could bargain for themselves. He claimed the union would not be there if a strike occurred. Despite whatever irritations these conversations may have created, when the union voted on September 12 whether or not to accept the employer's proposal for a new contract, no strike was called. The strike proposal was rejected by a tie vote.

On September 18 Riddle gave Allen notice that he had been fired. According to Riddle, Allen was discharged for parking his car in a no parking zone and being insubordinate to a police officer. These incidents occurred about one month before Allen's discharge. Allen had two previous disciplinary problems, each related to separate altercations with taxi customers in October of 1979. In each of those cases, Riddle had reduced the discipline imposed on Allen to warning letters after the union interceded to present Allen's side of the matter. This time, however, Allen was simply fired. Apparently referring to Allen's loyalty to the union rather than to the employer, Riddle said that, although he could have intervened on Allen's behalf to prevent the firing, he did not: "You didn't show me any loyalty, why should I show you any?"

At the next union meetings, held five days after Allen's firing, the members discussed both economic issues and their shop steward's discharge. A resounding majority voted at the end of the meetings to reject the employer's contract offer, to go out on strike, and to demand Allen's reinstatement. Three days later, in an attempt to avert a strike, the union and the employer met with a federal mediator. The union requested a dollar-per-hour wage increase and the reinstatement of Allen. The effort at conciliation failed, and a strike began the next day. On September 29, the union filed charges against the employer alleging that Allen's discharge violated subsections 8(a)(1) and (3). The Board issued a complaint for this charge on Christmas Eve of 1980.

In January of 1981, during the strike, three striking employees reapplied to the employer for jobs, in effect offering unconditionally to return to work. In February, the union filed another unfair labor practice charge against the employer. On March 16,

1981, Jones made an unconditional offer on behalf of the union members for their return to work. Shortly after making this offer, Jones agreed to the employer's strike settlement proposal, which included provision for the reinstatement of strikers without back pay according to seniority as jobs became available. The settlement also called for the union to withdraw the pending unfair labor practice charges and not reinstitute them.

In accord with the settlement, the union requested withdrawal of the unfair labor practice charges. On March 19, three days after the settlement, the union also instituted a new unfair labor practice charge alleging violations of subsections 8(a)(1) and (3) for the employer's refusal to reinstate the strikers upon their unconditional offers to return to work.

The Board refused to allow the withdrawal of the union's first charge concerning Allen's discharge. Instead, that charge and the newest charge were consolidated. An Administrative Law Judge (ALJ) found the employer had violated subsections 8(a)(1) and (3) both in firing Allen and in refusing to reinstate the strikers. The ALJ also refused to defer to the strike settlement agreement. The Board affirmed the findings and conclusions of the ALJ and essentially adopted his recommended order.

The employer argues: (1) the Board imposed an improper burden of proof in finding Allen was fired for protected union activity, and further that this finding is not supported by substantial evidence; (2) the Board's finding that the strike was an unfair labor practice strike is not supported by substantial evidence; and (3) the Board abused its discretion in failing to defer to the strike settlement agreement.

## II

■ We must enforce the decision reached by the Board if the Board correctly applied the law and if substantial evidence in the record as a whole supports the Board's findings of fact. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Royal Devel-*

*opment Co. v. NLRB,* 703 F.2d 363, 366 (9th Cir.1983).

■ The employer properly points out that in *Royal Development Co.* we questioned the Board's burden shifting rule in "mixed-motive" unfair labor practice claims established in *Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). *See Royal Development Co. v. NLRB,* 703 F.2d at 367–70. The Board applies *Wright Line* when an employee claims to have been discriminated against by his employer—for example, by having been fired—because of union activity or other protected conduct under section 7 of the Act, but the employer claims to have acted for a lawful business reason. To prove an unfair labor practice in such situations, the Board requires:

> that the General Counsel make a *prima facie* showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of protected conduct.

251 N.L.R.B. at 1089 (footnote omitted). The question of the application of this rule, however, is no longer open because the Supreme Court has approved the *Wright Line* burden shifting procedure. *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). *See Humes Electric, Inc. v. NLRB,* 715 F.2d 468 (9th Cir.1983). The ALJ properly applied this procedure.

■ We also conclude that the record contains substantial evidence that the employer contemplated discharges for protected activity. Riddle threatened Allen more than once that anyone who struck would be fired. The employer departed from its prior practice with respect to Allen when it failed to give him an opportunity to have the union intercede for him in the parking incident alleged to have precipitated his dis-

missal. Riddle, Allen's immediate supervisor, claimed he could have prevented Allen's firing but refused to do so because of irritation at Allen's loyalty to the union. Taken as a whole, the record provides substantial evidence to support the Board's finding of a wrongful discharge.

### III

The employer next argues that the Board lacked substantial evidence to support its finding that the strike was an unfair labor practice strike because the strike was for economic demands as well as for the firing of Allen. We held in *NLRB v. West Coast Casket Co.*, 205 F.2d 902 (9th Cir.1953), that a strike was "an unfair labor practice strike, even though other reasons were also present, since one of the reasons for it was to protest an unfair labor practice." *Id.* at 907 (citations omitted). *See also Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 820 (6th Cir.1975) ("If an unfair labor practice is a 'contributing cause' of a strike, then, as a matter of law, the strike must be considered an unfair labor practice strike"); *NLRB v. Wooster Division of Borg-Warner Corp.*, 236 F.2d 898, 907 (6th Cir.1956), *rev'd on other grounds*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); *NLRB v. Stilley Plywood Co.*, 199 F.2d 319 (4th Cir.1952), *cert. denied*, 344 U.S. 933, 73 S.Ct. 504, 97 L.Ed. 718 (1953); *NLRB v. A. Sartorius & Co.*, 140 F.2d 203, 206 (2d Cir.1944); *Juniata Packing Co.*, 182 N.L.R.B. 934, 935 (1970), *enforced in pertinent part*, 464 F.2d 153 (3d Cir.1972) (employer's unlawful pre-strike conduct "played a part in the decision to go out on strike"; the Board found the strike was an unfair labor practice strike).

■ Thus, the Board did not err in holding that a strike is an unfair labor practice strike "if one of the purposes of the strike is to protest an employer's unfair labor practice." The ALJ did not determine precisely "what weight the employees gave to Allen's

discharge in deciding to strike," but he clearly found the discharge had sufficient weight to be a cause of the strike. Substantial evidence on the record as a whole, particularly Jones's testimony about the discussion of Allen's discharge before the successful strike vote, and a comparison of that vote to the unsuccessful vote before Allen's dismissal, supports the ALJ's finding adopted by the Board. *See NLRB v. West Coast Casket Co.*, 205 F.2d at 907 (testimony of union business representative that discharge was one reason for strike was "substantial evidence").[1]

### IV

■ Finally, the employer argues the Board should have deferred to the "voluntary strike settlement agreement" (the agreement) rather than entertain NLRB proceedings for remedy of the unfair labor practices claimed by the union. Both the employer and the Board agree the Board has no statutory obligation to defer to private settlement agreements, *see* § 10(a) of the Act, 29 U.S.C. § 160(a), but may defer in its discretion. *Carey v. Westinghouse Corp.*, 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964); *id.* at 272, 84 S.Ct. at 409 ("The superior authority of the Board may be invoked at any time"); *cf.* § 10(k) of the Act, 29 U.S.C. § 160(k) (the Board must hear an unfair labor practice charge involving a jurisdictional strike under section 8(b)(4)(ii)(D) of the Act, 29 U.S.C. § 158(b)(4)(ii)(D), unless the parties within ten days of notice of the filing of the charge show they have settled or agreed on a method of resolution).

The employer asks us to reverse the Board, however, for abusing its discretion in not deferring to the agreement. The general policies of the Act and of labor law favor the private, amicable resolution of labor disputes whenever possible. We encourage voluntary settlements. They often minimize economic dislocations that may re-

---

1. We do not reach the employer's argument that the Board attempted improperly to shift the burden of proof on the unfair labor practice strike issue from the General Counsel to the company. In his conclusions, the ALJ did not indicate that the employer bore any burden of proof on those issues inconsistent with the law of this circuit. *See NLRB v. West Coast Casket Co.*, 205 F.2d 902, 907 (9th Cir.1953).

sult from a more prolonged dispute. Settled disputes do not add to an already overcrowded docket made up of parties who cannot or will not agree on a resolution. However, because the Board must act in the public interest to enforce public rights, *National Licorice Co. v. NLRB,* 309 U.S. 350, 364–65, 60 S.Ct. 569, 577, 84 L.Ed. 799 (1940), we have hesitated to hold that the Board abused its discretion in deferral decisions when unfair labor practices are involved. *See, e.g., NLRB v. Sebastopol Apple Growers Union,* 269 F.2d 705, 707 (9th Cir.1959).

Among the reasons given by the ALJ in concluding that he should not defer to the agreement were:

> First, the unfair labor practice nature of this strike and its effect on the employees' rights to reinstatement were never discussed. Second, the settlement does not include anything like the usual Board remedy for the serious violations involved, *i.e.* reinstatement and back pay. Third, the union, and presumably the employees, did not understand that the agreement was intended to extinguish all claims arising out of the strike.

We now determine whether, based on these reasons adopted by the Board, there was an abuse of discretion in the failure to defer to the agreement.

 The employer argues that the Board failed to follow its own criteria for deferral to a voluntary settlement. We agree that the Board must, to avoid abuse of its discretion, either adhere to or explain its departure from earlier clearly articulated criteria constituting self-imposed limits on its discretion. *See Douglas Aircraft Co. v. NLRB,* 609 F.2d 352, 354 (9th Cir.1979); *Hawaiian Hauling Service, Ltd. v. NLRB,* 545 F.2d 674, 676 (9th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977). The record shows that the Board neither failed to follow its own criteria nor otherwise abused its discretion. We need not decide whether the findings of fact underlying the Board's exercise of discretion require support by substantial evidence or only some evidence, because substantial evidence appears on the record here. *See generally Roadway Express, Inc. v. NLRB,* 647 F.2d 415, 424 n. 17 (4th Cir. 1981) ("substantial evidence" standard for factual support in deferral decision).

The ALJ's first reason for refusing to defer was both proper and well-supported. The employer successfully elicited testimony from Jones, the union's chief negotiator, that she did not know about the unfair labor practice stemming from the unconditional offer to return to work until after the settlement. The record shows little or no other evidence that the unfair labor practice nature of the strike and its relation to reinstatement was in the minds of the negotiators, much less discussed, during the settlement negotiations. The record similarly lacks evidence that the unfair labor practice nature of Allen's firing was ever discussed or became part of the agreement. Thus, the Board followed its own general guideline that an unfair labor practice issue must clearly be presented and acted on before deferral is proper. *See, e.g., Suburban Motor Freight, Inc.,* 247 N.L.R.B. 146, 146–47 (1980); *Yourga Trucking, Inc.,* 197 N.L.R.B. 928, 928 (1972); *Airco Industrial Gases,* 195 N.L.R.B. 676, 676–77 (1972); *see also Stephenson v. NLRB,* 550 F.2d 535, 538 n. 4 (9th Cir.1977).

The employer relies on *Roadway Express, Inc. v. NLRB,* 647 F.2d 415 (4th Cir.1981), in which the Fourth Circuit also recognized "that deferral . . . will not be appropriate if the merits of the claim which are the subject matter of the settlement and of the Labor Board proceedings were never discussed or considered in the settlement negotiations." 647 F.2d at 424 (citations and footnotes omitted). The court in *Roadway Express* reversed the Board's decision not to defer in a case of an unfair discharge settled by immediate reinstatement with no loss of seniority, but without back pay. It observed that the record provided evidence of a full hearing on the issue of the propriety of the discharge before an arbitration panel. *Id.* at 425. The employee settled after the arbitration panel split four to four on the grievance. *Id.* at 418. The union

fully acquiesced in the agreement, the employee returned to work, and more than four months later filed a complaint with the Board. *Id.* In contrast, the record before us, including the settlement agreement itself, does not include evidence of a full hearing, a discussion, or consideration of the propriety of Allen's discharge, or any consideration of the refusal to reinstate immediately the unfair labor practice strikers after their unconditional offer to return to work. *See Yourga Trucking, Inc.,* 197 N.L.R.B. at 928 (because the record did not indicate whether the issue of the employer's wrongful motivation in a discharge had been considered, deferral was improper); *Airco Industrial Gases,* 195 N.L.R.B. at 676–77 (where the arbitration proceedings touched only "tangentially" on the issue of discrimination in an employee's discharge, deferral was improper); *see also United States Steel Corp.,* 250 N.L.R.B. 387, 390 (1980); *cf. Central Cartage Co.,* 206 N.L.R.B. 337, 338 (1973)(agreement clearly reached the statutory issues under sections 8(a)(1) and (3) of the Act, stating the employee "was not laid off for union activity" and that the settlement was a "full, final, and complete settlement of the . . . matter").

The second reason for not deferring given by the ALJ was that "the settlement does not include anything like the usual Board remedy for the serious violations involved" and that "[t]he Agreement is simply not a reasonable compromise of the disputed claims." Although there may be some doubt whether the Board should refuse to defer merely because in hindsight it does not consider the compromise reasonable, the Board should insure that the strict statutory commands of the Act are not bypassed without reason. To this extent, therefore, it was not inappropriate for the Board to consider this factor. The contractual imposition of a remedy substantially less favorable to one party than the remedy usually ordered by the Board may indicate the statutory basis of the usual remedy received no consideration. It may also indicate a violation of the broader policy underlying the usual remedy.

The employer claims the agreement embodies a fair, not a repugnant, compromise and cites several cases for comparison. Each is distinguishable from the facts of this dispute. For example, in *United Aircraft Corp.,* 192 N.L.R.B. 382 (1971), *enforced in part and enforcement denied in part on other grounds,* 534 F.2d 422 (2d Cir.1975), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976), a private settlement ended a violent economic strike by granting the strikers some reinstatement rights greater than applicable Board decisions would have required at the time, *id.* at 387–88, plus apparently requiring some compromises in the new collective bargaining contract. The settlement did not purport to resolve any unfair labor practice claim. *See American Cyanimid Co.,* 239 N.L.R.B. 440, 441 (1978), *citing United Aircraft Corp.* The Board has also expressly refused to extend its reasoning for deferral in *United Aircraft Corp.* to cases involving unfair labor practice strikes. 192 N.L.R.B. at 387–88 n. 31. As the case before us involves an unfair labor practice strike, *United Aircraft Corp.* is not in point.

*Central Cartage Co.,* 206 N.L.R.B. 337 (1973), is not helpful because it involved a union jurisdiction dispute to which all the parties explicitly agreed an employee layoff had no relation. The case does not parallel the matter before us. Furthermore, in *Central Cartage Co.* only the General Counsel felt the settlement had not resolved all the labor questions in the situation; here, the union clearly believed the dispute with the employer was only partially resolved by the agreement.

In *Coca-Cola Bottling Co.,* 243 N.L.R.B. 501 (1979), one employee received an indefinite suspension for alleged misconduct. Grievance proceedings culminated in a settlement reducing the suspension to a temporary layoff. The employee explicitly agreed to drop a previously-instituted unfair labor practice charge and to forego all other actions of any kind, past or future, in connection with the layoff. He then filed a new unfair labor practice charge alleging the explicit waiver was itself an unfair la-

bor practice. The Board found no unfair labor practice in the new charge. The case before us fails to present any similar explicit waiver.

The case before us is also unlike *Roadway Express, Inc. v. NLRB,* 647 F.2d at 426, where the court held that "there is no evidence ... of any anti-union animus on the part of the employer or any action on its part 'repugnant to the terms of the Act.' " Nor is this a case where the "employer turned to the union," *id.,* and negotiated a remedy through established arbitration procedures in which only the employee later disagreed. Instead, the case before us is more like *Wooster Division of Borg-Warner Corp.,* 121 N.L.R.B. 1492, 1494–95 (1958), where the Board refused to defer to a strike settlement agreement prescribing preferential hiring without back pay for unfair labor practice strikers; and *American Cyanimid Co.,* 239 N.L.R.B. at 442, where the Board refused, as repugnant to the Act, to defer to an economic strike settlement agreement reducing an employee's discharge for protected activities to a suspension.

We now look to the third reason given by the ALJ: "the union, and presumably the employees, did not understand that the agreement was intended to extinguish all claims arising out of the strike." *See generally Spielberg Manufacturing Co.,* 112 N.L.R.B. 1080, 1082 (1955) (establishing Board practice of considering whether the parties agreed to be bound on all alleged points in deciding deferral). The agreement does not waive new unfair labor practice actions by the union against the employer, nor does it waive any unfair labor practice actions by the employees. It makes no mention of back pay. It provides no indication that the parties considered the various issues of fault connected with the

strike. Though we do not hold any of these are necessary contract provisions for shutting the door on all claims and issues arising out of any particular series of labor problems, their absence in this case indicates the parties intended to leave the door open. The record supports this conclusion. The union filed new charges three days after signing the agreement. From these new charges, it appears that the union believed the negotiations and agreement did not cover the unfair labor practice issues as statutory matters and were not a waiver of all claims by the employees or union.[2]

Thus, substantial evidence on the record as a whole supports the reasons for non-deferral given by the ALJ and adopted by the Board. We do not hold that other reasons could not be equally important. We only hold that based on the record in this case, the Board did not abuse its discretion in not deferring to the agreement. Therefore, because the Board properly found an unfair labor practice strike existed between the employer and the union, and because the Board properly found the employer unfairly dismissed Allen for protected activities, we enforce the Board's order.

PETITION DENIED; ENFORCEMENT GRANTED.

---

2. We do not reach the question of whether Board policy requires explicit waiver of statutory rights as a prerequisite to required deferrals; nor do we reach the question of whether a union may waive its members' rights to have unfair labor practices remedied, *see American Cyanimid Co.,* 239 N.L.R.B. 440, 441 (1978). Rather, we affirm the finding of the Board that the union and its members did not intend the

agreement to extinguish all claims arising from the strike and surrounding circumstances. In other words, the union made neither an explicit nor implicit waiver of all unfair labor practice claims. As to the charge involving Allen, the union and the employer could not contract for more than the law allows. The union's agreement to withdraw that charge always stood subject to Board approval.